UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

DARRIN GOLDBERG,

                 Petitioner,

     -against-

FRANK TRACY,

                Respondent.

------------------------------------------------------------x

                             MEMORANDUM &
                             ORDER

                             01-CV-8454

JACK B. WEINSTEIN, Senior United States District Judge

APPEARANCES:

For Petitioner Darrin Goldberg:

       Green & Willstatter

             By:    Richard D. Willstatter

For Respondent Frank Tracy:

       Nassau County District Attorney's Office

             By:    Douglas Noll
                    Andrew Fukuda

# TABLE OF CONTENTS

I.   Introduction ..................................................................................................5

II.  Procedural and Background History...............................................................6

    A.   Guilt, Crime and Trial ...........................................................................6

        1.   Admission of Guilt ........................................................................6

        2.   Crime ...........................................................................................8

        3.   Investigation and Trial...............................................................11

    B.   State Court Direct Appeals...................................................................21

        1.   To the Appellate Division From Conviction .............................21

        2.   For a Writ of Error *Coram Nobis* to the Appellate Division.....23

    C.   First Round of State Court Collateral Challenges .................................24

    D.   Initiation of Federal Habeas Proceedings.............................................27

    E.   Second Round of State Collateral Challenges.......................................29

        1.   Initial Proceedings at Trial Level ..............................................29

        2.   Appellate Proceedings ...............................................................30

        3.   Evidentiary Hearing...................................................................31

        4.   Trial Court's Decision ...............................................................33

        5.   Leave to Appeal..........................................................................35

    F.   Return to Federal Habeas Court After Exhaustion of State Remedies...................35

        1.   Reopening of Federal Habeas Proceedings ...............................35

        2.   Appointment of Counsel and Discovery ....................................37

        3.   Objection to Evidentiary Hearing...............................................38

4.  October 24, 2007 Evidentiary Hearing .......................................................39

    a.  State Appellate Defense Counsel .................................................40

    b.  Wayne Kiernan ...........................................................................44

    c.  State Trial Counsel ......................................................................45

    d.  Darrin Goldberg...........................................................................47

5.  Issues Regarding Goldberg's Production at the October 24, 2007 Evidentiary Hearing.......................................................................................51

III. Respondent's Objection to the October 24, 2007 Evidentiary Hearing .............................52

    A.  Law on Evidentiary Hearings in Federal Habeas Cases........................................52

        1.  Statutes Regulating Evidentiary Hearings....................................................52

        2.  Rules Regulating Evidentiary Hearings .....................................................54

        3.  Analysis of the Statutes, Rules and Caselaw .............................................55

    B.  Application of Law to Facts ...................................................................60

IV. Production of Goldberg at the October 24, 2007 Evidentiary Hearing..............................62

    A.  Law on Production of Habeas Petitioners at Federal Evidentiary Hearing...........62

    B.  Law on Waiver of Production in a Habeas Evidentiary Hearing ..........................65

    C.  Application of Law to Facts ...................................................................66

V.  Ineffective Assistance of Appellate and Trial Counsel .......................................................68

    A.  Application of AEDPA...........................................................................68

        1.  Standard of Review ..............................................................................68

        2.  Presumption of Correctness and Exhaustion ...............................................69

        3.  Application of Law to Facts ...................................................................70

    B.  Law on Ineffective Assistance of Counsel .........................................................70

|  |  | 1. | Generally ......................................................................................70 |
|  |  | 2. | Plea Process ................................................................................73 |
|  |  | 3. | Sentence Exposure.......................................................................75 |
|  |  | 4. | Appellate Counsel.......................................................................76 |
|  | C. | | Application of Law to Facts ...................................................................78 |
|  |  | 1. | Trial Counsel ..............................................................................78 |
|  |  |  | a. Failing to Convey or Advise on Plea Offers.................................78 |
|  |  |  | b. Misrepresentation of Sentence Exposure .......................................80 |
|  |  | 2. | Appellate Counsel.......................................................................81 |
| VI. | | | Certificate of Appealability .............................................................................84 |
| VII. | | | Conclusion......................................................................................................85 |

## I.     Introduction

This case presents an intricate set of procedural issues in habeas corpus proceedings challenging state convictions, particularly the desirability of a federal evidentiary hearing and right of the prisoner to be physically present at the hearing. Based upon applicable statutes, rules and caselaw there is substance to respondent's argument that a federal evidentiary hearing was redundant and should not have been granted after full and fair state post-conviction inquiry.

The comprehensive federal hearing was permitted in the court's discretion. Retention of a broad power to investigate in federal habeas proceedings is supported by continuing revelations of miscarriages of criminal justice in this state and our country.

The need to physically produce a state prisoner in federal court for a hearing is doubtful in view of available modern communication facilities. In the instant case the petitioner's rights were fully protected when he participated in a federal evidentiary hearing from a state prison via telephone.

The present petition is part of the struggle by an articulate and intelligent man—petitioner Darrin Goldberg—to undo his mistake in not accepting a reasonable plea offer. After trial a much longer sentence than that offered for the plea was imposed.

Goldberg filed a pro se petition for a writ of habeas corpus in this court pursuant to section 2254 of Title 42 of the United States Code in December 2001. The petition was held in abeyance until determination of his pending state court collateral attacks. The federal proceeding was reopened in July 2007 after Goldberg had exhausted state court remedies.

He now makes two claims: ineffective assistance of appellate counsel and ineffective assistance of trial counsel. His argument is that appellate counsel was ineffective when she

failed to raise an allegedly strong issue on direct appeal to the Appellate Division—whether the trial court erred when it failed to excuse a juror whose breathing became uncomfortable during deliberations. In his ineffective assistance of trial counsel claim, he contends that his attorney failed to advise him of a plea offer and underestimated his sentence exposure were he to be convicted after trial.

Counsel was appointed by this court in August 2007. An evidentiary hearing was scheduled over respondent's objection. The hearing was held on October 24, 2007, with petitioner participating from the prison by telephone. By Order dated December 3, 2007, the court found that Goldberg had waived his physical presence in the courtroom.

For the reasons set forth below, (1) an evidentiary hearing was properly held in this case; (2) Goldberg waived his physical presence at the hearing; (3) the ineffective assistance of counsel claims are without merit; and (4) a certificate of appealability should be issued.

## II.    Procedural and Background History

### A.    *Guilt, Crime and Trial*

#### 1.    *Admission of Guilt*

The details of the crime are not in serious dispute. See Transcript of Federal Habeas Evidentiary Hearing ("Tr. Fed. Habeas Hr.") at 160, Docket Entry No. 53 (Goldberg admitting that he is not innocent of the crime). That Goldberg had admitted his guilt appears to have had no effect on the outcome of collateral attacks on his conviction in either state or federal court. Yet, details of his admissions suggest that he had a tendency to blame his state trial attorney for his own decisions and that his credibility was somewhat tarnished.

6

In the state court hearing, see infra section II.E.3, Goldberg admitted his guilt, explained a prior robbery conviction, and indicated why he thought he deserved a relatively short period of incarceration:

Q.   Now, so you know you are guilty, correct?

A.   Yes.

Q.   You know there is a seven-year [plea] offer on the table and you are not going to accept that, right?

A.   That's correct.

Q.   You want something better?

A.   Yes.

Q.   [I]s that because you had been convicted of a robbery before in [19]94, correct?

A.   Yes.

Q.   And you had gotten five years probation, isn't that right?

A.   That's correct.

Q.   And [you were charged with] . . . criminal use of firearm . . . in that case, right?

A.   Yes.

Q.   So you had some familiarity with the crime of robbery?

A.   Yes.

Q.   Both committing it, right?

A.   Yes.

Q.   And also being prosecuted for it, right?

A.   That's correct.

See Transcript of State Evidentiary Hearing ("State Evid. Hr.") at 87-88, attached as Exhibit

XXXIX to Respondent's Brief in Opposition to Habeas Petition ("Resp. Fed. Habeas Br.").

At the federal evidentiary hearing, see infra section II.F.4, Goldberg explained his

reasons for initially refusing to take responsibility of the crime:

> Q. [A]fter the jury convicted you, before you were sentenced, there was a presentence investigation and you were interviewed by presentence investigators. . . ?
>
> A. That's correct.
>
> Q. And you told them you were innocent of the crime, is that right?
>
> A. I did, yes.
>
> Q. And you knew at the time you said [that] that it wasn't true.
>
> A. That's correct.
>
> Q. So you deliberately lied to them.
>
> A. Based on the advice I received from [my trial counsel], yes, I did.
>
> Q. Did [trial counsel] tell you to lie to them?
>
> A. [Trial counsel] said I should not talk about the case whatsoever. I should not admit my guilt.
>
> . . . .
>
> Q. The decision to lie was your own decision.
>
> A. Ultimately, I made the decision, but again, it was based on [trial counsel]'s advice.

Tr. Fed. Habeas Hr. at 160-61.

*2.     Crime*

In the early morning of August 9, 1996, Sean Halligan, a college student, was working as an attendant at a Mobil gas station in Wantagh, New York. See Trial Transcript ("Trial Tr.") at 108, attached Exhibit I to Resp. Fed. Habeas Br.

At about 4:45 a.m., Melvin McLeod and Darrin Goldberg entered the store attached to the station. See id. (location of the gas station); id. at 110-11 (description of the perpetrator's entrance into the store); id. at 130 (identifying McLeod); id. at 215 (parties stipulating that McLeod "was one of the two robbers involved"); but see id. at 132 (Halligan unable to identify Goldberg as a perpetrator). Halligan was seated behind the counter, reading a newspaper. Id. at 110. McLeod carried a gun while Goldberg, who was wearing sunglasses, carried a black mesh bag. Id. at 111, 115. McLeod pointed the gun at Halligan and instructed him to turn over money. Id. at 111. Halligan testified at the trial:

> [I] turned to the cash register, pressed the button that would open the register. The register showed some computer error, and the gunman ran over to me, put his hands on my shoulders and forced me down behind the counter and said, "if you don't give me all the money I'm going to kill you."
>
> And I was pleading with him, "take anything you like. I'll give you the money, that's no problem. Let me get up to the register so I can open it." And finally he let me up.
>
> [H]e gave me like two seconds to try to open it. So there was an error still in the computer. And then again he grabbed me by my shoulders and forced me down to my knees behind the counter, and then he put the gun in my face and said he was going to kill me. . . . [H]e said he would give me five seconds before he shoots me. He was counting down, yelling at me, cursing, going five, four, three, two. And I'm pleading with him, "take anything you like. Take money, whatever you want."

Id. at 111-12.

9

McLeod then ordered Halligan to lie down behind the counter. Id. at 112. Halligan

picked up the phone and tried to call the police. He was hit over the head with a blunt object. Id.

at 111-13. He then tried to convince the perpetrators that the police were outside. Id.

Goldberg and McLeod ran to check for the police and returned. Id. at 114. According to

Halligan, the following then occurred:

> [O]ne of them said, "now we're going to tape you up." And both of the
> men charged me. I tried to fight them off; they were both punching me, kicking
> me. I was trying to fight both of them off. At the same time the gunman was in
> closer proximity to me, punching me in my chest. I was trying to fight him. The
> guy with the sunglasses grabbed my legs.
>
> . . . .
>
> The guy with the sunglasses, I looked at him to see what he was doing at
> that time. He was going to a black mesh bag, reaching in there. My attention was
> focused at him to see what he was going to produce from the bag.
>
> . . . .
>
> The guy with the sunglasses took some duct tape out of the mesh bag, and
> sort of [started] ripping pieces of tape off of this.
>
> In the meantime, the gunman was still fighting with me, trying to pin my
> arms against my chest with his knee. Then the guy with the sunglasses crouched
> down. He . . . taped up my ankles before I even realized it, and then the gunman
> still pinning my arms on my chest, the guy with the sunglasses then taped my
> wrists up and then my knees, and then he took another piece of tape and put it on
> the bridge of my nose here to cover my eyes.

Id. at 114-15. The perpetrator who tore pieces of duct tape from a roll, Goldberg, was not

wearing gloves. Id. at 167.

McLeod smashed the cash register on the floor. When it broke open, he removed the

money. Id. at 117. He also tore a door off a locked cabinet, grabbing cartons of cigarettes;

pulled the telephone out of the wall; and threw around frozen food containers and candy. Id.

Both McLeod and Goldberg then ran out of the store. They carried cash from the register, cigarettes, candy and TV dinners. Id. at 117.

Halligan, whose head was bleeding, hopped to a pay phone located outside the store and called 911. Id. at 118-20. A woman, who had just arrived at the gas station, helped remove the duct tape. Id. at 120-21. Halligan was taken by ambulance to the hospital where he received stitches to his head. Id. at 123.

3. *Investigation and Trial*

Immediately after the crime and at trial Halligan gave detailed descriptions of both perpetrators. He stated that the gunman (McLeod) was an African-American man, six feet tall, who wore a black-hooded sweatshirt, purple shirt and black pants, had a space between his teeth, and held the gun in his right hand. Id. at 127. He described the second perpetrator (Goldberg) as an African-American man, between 5'7 and 5'9", wearing black-framed sunglasses with wide lenses, a black baseball cap, and a red and blue flannel shirt. Id. at 128. Halligan himself was 5'9" tall. Id. at 146.

The police determined that latent fingerprints found on one of the TV dinner boxes recovered from the scene were those of McLeod. Id. at 195-96. They had also recovered five pieces of duct tape from the crime scene. Id. at 259-60. A fingerprint on one of the pieces was from Goldberg's right thumb and a fingerprint on another was from Goldberg's left middle finger. Id. at 256-62, 270. Goldberg was arrested after the police compared the prints from the crime scene with Goldberg's, which were already on file because of his two prior convictions. Id. at 270.

On March 27 1997, Halligan was able to identify McLeod from a photographic array as the gunman. Id. at 143. On the same date Halligan was shown a photographic array that contained Goldberg's picture. Id. at 160-61. Halligan could not identify Goldberg as the second perpetrator. Id. at 161. At the time of arrest, Goldberg's height was 6'2"—not between 5'7" to 5'9" as Halligan had earlier described it. Id. at 224.

Goldberg was charged in Nassau County Supreme Court with robbery in the first degree (N.Y.P.L. § 160.15 [4]), two counts of robbery in the second degree (N.Y.P.L. §§ 160.10 [1] and [2][a]), and assault in the second degree (N.Y.P.L. § 120.05 [6]). Id. 83-86. McLeod pled guilty to a class B violent felony of robbery in the first degree and was sentenced to a determinate sentence of imprisonment of fifteen years. See Decision and Order dated April 9, 2007 at 1, attached as Exhibit XXX to Resp. Fed. Habeas Br.

Goldberg, represented by counsel, proceeded to trial in March 1998. Id. This trial resulted in a hung jury. Two out of the twelve jurors had voted not to convict. Id.; see State Collateral Attack Evidentiary Hearing ("State Evid. Hr.") at 66, attached as XXIX to Resp. Fed. Habeas Br. He was retried for the same charges in June 1998. See Decision and Order dated April 9, 2007 at 1-2. Goldberg was represented by the same counsel at the second trial. Trial Tr. at 1. Since it was a retrial, the usual pretrial motions and practice was unnecessary. See id. at 2-3. Voir dire appeared to be effective, with Goldberg's right to a fair jury protected. See id. at 2-77.

The defense's theory was that Goldberg was not one of the men involved in the robbery. Id. at 95. It sought to prove this by, among other things, stressing the fact that Goldberg was

12

6'2" tall while Halligan had told the police that the second perpetrator was between 5'7" to 5'9".

In his opening statement to the jury, defense counsel stated:

> [Halligan] gave statements to the detective . . . and Officer . . . a couple
> [of] hours after [the crime] happened: I was sitting there and in came a tall guy
> and a short guy. He said it a number of times.
>
> He described in detail in a sworn written statement to . . . these two men.
> He said the tall guy was about six foot tall, that he had a gap . . . between his front
> teeth. He described the articles of clothing these two men were wearing.
>
> You'll come to find out during this trial that that tall man he was referring
> is Melvin McLeod.
>
> And then he went into a detailed description of the short guy. He'll tell
> you, just like he said in his sworn written statement to the police that day, that the
> second man, the shorter guy, was somewhere between five-six and five-eight.
>
> . . . .
>
> Sean Halligan stands approximately five-eight. He described a man his
> own size.
>
> . . . .
>
> [H]e didn't describe a man six-foot-two. As you'll find out, Darrin
> Goldberg [is] described [as] the short man.

Id. at 95-96.

Defense counsel also stressed the fact that Halligan failed to identify Goldberg in a

photographic array:

> Mr. Halligan looked at the photopack containing the photograph of Melvin
> McLeod and he said, that guy right there, which came to be Melvin McLeod.
>
> Then [the] Sergeant . . . showed him a photo array, and one of the
> photographs in that array was that of Darrin Goldberg. He said, could you please
> pick out the shorter guy? And sure enough, Mr. Halligan could not make an
> identification, although you'll hear that Mr. Goldberg's picture was right there.

Id. at 97.

With regard to the fingerprint evidence on the duct tape linking Goldberg to the crime, the defense provided a rebuttal. Goldberg's father had testified that duct tape was used in connection with his business of buying old batteries for recycling—the tape was used to secure the batteries during transportation in the company van. Id. at 358 (describing the business); id. at 365 (use of duct tape). According to his father, Goldberg had access to the duct tape because his son often assisted in the battery business. Id. at 365-66. Goldberg was simultaneously working for an airline, training for another airline job and acting as a football coach. Id. at 367. The father testified that Goldberg also used duct tape when he borrowed the father's company van during August 1996 to move from his apartment. Id. at 366-68. He said that McLeod also had access to the duct tape since he was Goldberg's uncle who stayed at Goldberg's apartment. Id. at 368-69, 371.

Defense counsel's cross-examination of the prosecution's expert witnesses sowed confusion about how a fingerprint could have been made, and how it might have been imprinted innocently prior to the crime. See id. at 301-10, 324-37, 338-46, 349-50. One prosecution witness admitted that he could not know if the pieces of the duct tape were all ripped from the same roll. Id. at 326. He also conceded that if a person walked holding a role of duct tape, a thumb imprint might realistically be left on the outside of the tape and might remain there for as long as six months. Id. at 330-31, 340. Through the cross-examination defense counsel was able to demonstrate that if Goldberg had ripped the pieces of tape that contained his prints at the scene, those pieces of tape would probably have had more prints upon them. Id. at 333-38; id. at 413-15 (trial counsel's summation). The defense argued that the limited presence of Goldberg's

14

prints, rather than suggesting guilt, were indicative of the fact that the prints had been placed on tape rolls before those rolls were brought to the crime scene by McLeod. Id.

Defense counsel's summation was skillful. He pointed out discrepancies between the height of Goldberg and the perpetrator. Id. at 385, 387, 392-404. He stressed that Halligan had ample opportunity to view both perpetrators as evidenced by his accurate description of McLeod. Id. at 369. The disparity—as much as a half-a-foot—in height between Goldberg and the description of the second perpetrator demonstrated, he argued, that the wrong person had been charged with the crime. Id. This, he contended, was precisely the reason why Halligan could not identify Goldberg in a photographic array, although he had been able to select McLeod from an array. Id. at 403-04. Counsel properly devoted a principle argument in the summation to demonstrating how Goldberg's fingerprint might have been innocently placed on the duct tape, which was then used in the crime without Goldberg's knowledge. Id. at 385, 388-90, 404-16. The rest of the summation on other matters such as reasonable doubt was also effective.

After the jury retired for deliberations, the following events relating to indisposition of a juror took place:

| The Court: | Before we broke for lunch, actually after we broke for lunch and I let everybody go, . . . a juror handed this note. |
| | We will bring the juror in and see what the problem is. |
| | (Juror No. 2 entering courtroom.) |
| The Court: | Sir, I received your note. It says you would like to speak to me. |
| Juror No. 2: | I have asthma, and I feel like its getting progressively worse, and I'm not feeling very well. |
| The Court: | Do you use an inhaler? |

15

| | |
|---|---|
| Juror No. 2: | I use four, and I have them with me. They don't cure the asthma. |
| The Court: | I have a sufferer, my law secretary. He has asthma too. |
| | Do you feel you can go on for a little while? See how the condition progresses, to see if— |
| Juror No. 2: | I feel like it is getting worse. |
| The Court: | Well, are you that uncomfortable that you could not deliberate at this point? |
| Juror No. 2: | I could probably go on a little longer. I mean, I don't know how long. I just don't feel well. |
| The Court: | I ask you to give it . . . a try, and if it does take any turn for the worse, you let us know and we'll talk to you again. All right? |
| Juror No. 2: | Yes. |
| The Court: | Thank you. |
| | Is that acceptable? |
| | Any questions? |
| Kiernan [prosecutor]: | Judge, it was a bifurcated question, so to answer to that would be yes, no. |
| [Defense Counsel]: | I'm spent from my closing. I can't argue any more. |
| The Court: | We'll mark this note Court's Exhibit whatever it is. |
| | (Juror No. 2 left the courtroom.) |

Upon returning from recess the following took place indicating the juror's

continuing discomfort:

| | |
|---|---|
| The Court: | Gentlemen, we had two notes. The first had to do with exhibits being requested. I don't remember exactly what |

16

they were. Three separate things. I'll get you the note in a second.

And the others, another note from Juror No. 2. He says he would like to speak to [the judge].

. . . .

| | |
|---|---|
| [Defense Counsel]: | Can I see while we're talking to the juror? |
| The Court: | Sure. |
| | (Handing note to [trial counsel].) |
| | (Juror No. 2 entered the courtroom.) |
| Juror No. 2: | Sorry, your Honor, I really don't feel very well. |
| The Court: | Do you think we should suspend and send everyone to a hotel.? |
| Juror No. 2: | I don't want to do that to people. |
| The Court: | They're here. If you feel that you are uncomfortable and you don't think you can go on, we can either do that or I can have attorneys ask you and see what their feelings are. Thin[k] about that. |
| | And I will ask the attorneys, too. |
| | Mr. Kiernan, do you have any questions of Juror No. 2? |
| Mr. Kiernan: | No. |
| The Court: | [Counsel for Mr. Goldberg], do you have any questions of Juror No. 2? |
| [Defense Counsel]: | Just the same type [of] medical questions, I guess, Judge, that you would ask him, based on the way you feel right now. |
| | Obviously I don't want you to continue with deliberations right now. In your experience with your asthma condition, do you think that perhaps if you had a good night's rest at a hotel, for instance, that tomorrow you might be able to get |

17

|              |                                                                                                                                                                                                                                                                                                                                                                                              |
|--------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|              | back into it, or is it the kind of thing that's continued in your life where you get to a point and it stays that way?                                                                                                                                                                                                                                                                        |
| Juror No. 2: | I feel it's going to get worse, the way I feel now. I know how I'm feeling.                                                                                                                                                                                                                                                                                                                   |
| The Court:   | Is this like an onset of an attack; is that what you're telling us?                                                                                                                                                                                                                                                                                                                           |
| Juror No. 2: | No, it's—I have a tightness in my chest and shortness of breath. I just feel—the postnasal drip. I hate to bore you with the symptoms. I seem like a hypochondriac.                                                                                                                                                                                                                            |
| The Court:   | No, I know it's a serious disease. My law secretary has it.                                                                                                                                                                                                                                                                                                                                   |
|              | Counsel approach.                                                                                                                                                                                                                                                                                                                                                                             |
|              | (Whereupon, an off-the-record discussion was held at the bench.)                                                                                                                                                                                                                                                                                                                             |
| The Court:   | We're gong to ask you to go back to the jury room for the time being. Chances are that we will suspend for the evening.                                                                                                                                                                                                                                                                       |
| Juror No. 2: | Your Honor, may I say something?                                                                                                                                                                                                                                                                                                                                                              |
| The Court:   | Certainly.                                                                                                                                                                                                                                                                                                                                                                                    |
| Juror No. 2: | I don't want to affect the jurors, you know, if we were to suspend now. I really would not want to do that to the others.                                                                                                                                                                                                                                                                     |
| The Court:   | The important thing is, if you're not healthy, we don't want anybody making ultimate sacrifices here for jury service. We appreciate the fact that you're giving us the time, we appreciate the fact that you're giving us your best effort. No one in this courtroom wants to jeopardize your health for the sole purpose of losing perhaps an hour, hour and a half deliberations' time. That's all we're talking about. |
| Juror No. 2: | I would—I thought that maybe I would have been replaced or dismissed from the jury. I didn't want to hold everyone up. I just don't feel good.                                                                                                                                                                                                                                                |
| The Court:   | Is it to the point where you cannot deliberate?                                                                                                                                                                                                                                                                                                                                               |

| | |
|---|---|
| Juror No. 2: | I'm not concentrating as much as I'd like to. I'm not participating as much. |
| The Court: | Let[] me suggest you continue as long as you can, like we did before. And please don't hesitate, if you have any thoughts, any second, third thoughts about being able to continue, let me know again and we'll pursue it at that point. |
| | In the mean time I will discuss it with the attorneys. |
| Juror No. 2: | In other words, the only option is that you would dismiss the jury? |
| The Court: | Not dismiss. I would suspend deliberations for tonight, send you out for dinner to the hotel and hopefully you come back rested in the morning. |
| Juror No. 2: | I wouldn't want to do that to the other jurors. They're working hard in there. |
| The Court: | It's not that bad. |
| Juror No. 2: | I would not do that. |
| The Court: | Let's continue for the time being. Let me know if there is any problem. |
| | Thank you. |
| Juror No. 2: | You're welcome. |
| | (Juror No. 2 left the courtroom.) |
| The Court: | Mr. Kiernan, was that acceptable to the People, what just transpired? |
| Mr. Kiernan: | Well, just so that I'm clear, Judge, I believe that it is the plan to send the jury out for the night at this time; am I not correct? I believe it is the plan to send, to cease deliberations? |
| The Court: | No, I suggested to Juror No. 2 that I was going to do that, and he said he doesn't want to do that to the other members |

19

of the jury yet, so he's going to try to continue to deliberate for as long as he can. So we're basically in a holding pattern, not unlike like we were two hours ago.

As far as the future is concerned, I guess if and when it happens, I have to approach you at that time.

All right, [counsel for defendant]?

[Defense Counsel]: Judge, it just seems to me that if—I don't disagree with what your Honor has decided to do, and I will just repeat what I have said at the bench, that I will rely on whatever your Honor chooses to do. It just seems to me that if that gentleman feels as bad as he does, which necessitated him appearing two times within an hour regarding his medical condition, it concerns me that that might cause him to rush deliberations to some extent.

He already told us he can't concentrate, and I would thin[k] it might be a suggestion, based on what he said, to send the jury out at this point, let him recover, and so therefore we have a juror that's at its fullest rather than a juror that can just be a warm body amongst the twelve.

The Court: I suggested that to him twice, and basically he revolted, for want of a better word, and said he didn't want to do that to the jurors.

We're not talking about a great deal of deliberations back between now and the time they would be sent out in any event. This is the way I think to proceed.

[Defense Counsel]: Fine. Thank you, your Honor.

The Court: Like I said, after this everything is in your hands. Everything has to be consented to in writing, if there will be any substitute.

My understanding is that you would not consent to a substitute at this time?

[Defense Counsel]: We haven't made up our minds, but as of this time, for all we know, we may have a verdict in a half hour.

The Court: We have been through this before.

All right, to be continued.

(Recess.)

Id. at 530-37.

At 4:45 p.m., the jury sent a note to the judge asking to hear the court's charges on circumstantial evidence. Id. at 537. The jury was called back to the courtroom at about 5:00 p.m. and was instructed by the judge on circumstantial evidence. Id. at 537-43.

At 5:50 p.m. that evening the unanimous jury returned a verdict of guilty on all counts. Id. at 545-46. After receiving the verdict and upon request of Goldberg's counsel, the court polled all twelve members of the jury. Id. at 546-47. All jurors, including Juror No. 2, agreed with the verdict. Id. at 547.

Goldberg was sentenced to: (1) a determinate term of sixteen years imprisonment for the first degree robbery charge; (2) two terms of fifteen years imprisonment for the two counts of second degree robbery charges to run concurrently with the first sentence; and (3) a determinate term of seven years imprisonment for the second degree assault charge to run concurrently with the first three sentences. See Sentencing Transcript at 10-11, attached as Exhibit II to Resp. Fed. Habeas Br.

**B.** **State Court Direct Appeals**

*1.* *To the Appellate Division From Conviction*

Through appointed counsel Goldberg appealed his conviction to the Appellate Division in April 1997. See Goldberg's Appellate Brief, attached as Ex. III to Resp. Fed. Habeas Br. He presented two claims for reversal: the circumstantial fingerprint evidence was legally insufficient to prove guilt beyond a reasonable doubt and the verdict was against the weight of the evidence.

21

See id. at 11, 15. His appellate counsel's sixteen-page brief made a strong argument on

Goldberg's behalf by summarizing the voluminous trial record in a light favorable to Goldberg

and citing eight New York state court cases. See id. at 1-16.

On November 22, 1999, the Appellate Division unanimously affirmed the trial court's

judgment. See People v. Goldberg, 698 N.Y.S.2d 532, 533 (N.Y. App. Div. 2d Dep't 1999),

attached as Exhibit V to Resp. Fed. Habeas Br. It wrote:

> The defendant's contention that the fingerprint evidence was insufficient
> to prove that he was one of the perpetrators who robbed the gas station and
> assaulted the complainant is unpreserved for a appellate review (see, [New York]
> CPL 470.05[2]; People v. Gerofsky, 244 AD2d 569; see also, People v. Flores, 84
> NY2d 957, 960). In any event, viewing the evidence in the light most favorable
> to the People (see, People v. Contes, 60 NY2d 620), we find that it is legally
> sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover,
> resolution of the issues of credibility, as well as the weight to be accorded to the
> evidence presented, are primarily questions to be determined by the trier of fact,
> which saw and heard the witnesses (see, People v. Gaimari, 176 NY 84, 94). Its
> determination should be accorded great weight on appeal and should not be
> disturbed unless clearly unsupported by the evidence (see, People v. Garafolo, 44
> AD2d 86, 88). Upon the exercise of our factual review power, we are satisfied
> that the verdict of guilty is not against the weight of the evidence (see, CPL
> 470.15[5]).

Id.

Appellate counsel then sent a seven-page letter to the New York Court of Appeals

seeking leave to appeal. See Letter dated Dec. 12, 1999, attached as Exhibit VI to Resp. Fed.

Habeas Br. She argued that the Appellate Division "erred when it ruled that . . . Goldberg's

claim was unpreserved for appellate review. The legal sufficiency of the fingerprint evidence

was the only contested issue below and the defense implicitly raised this insufficiency when it

moved for a trial order of dismissal." Id. With regards to the merits, she made the argument

used in her appellate brief.

22

By Certificate dated January 25, 2000, the New York Court of Appeals denied Goldberg

leave to appeal. See New York v. Goldberg, 94 N.Y.2d 880 (2000), attached as Exhibit VIII to

Resp. Fed. Habeas Br.

2.    *For a Writ of Error* Coram Nobis *to the Appellate Division*

Goldberg then filed a pro se petition for a writ of error coram nobis seeking to vacate the

decision of the Appellate Division on the basis of ineffective assistance of appellate counsel. See

Memorandum of Law in Support of Coram Nobis Application ("Coram Nobis Memo."), Docket

Sheet for 01-CV-8454, Entry No. ("Docket Entry No.") 54; Reply Memorandum in Support of

Coram Nobis Application ("Coram Nobis Reply Memo."), attached as Exhibit IX to Resp. Fed.

Habeas Br. In his pro se forty-two page brief and ten-page reply brief in support of the coram

nobis application, Goldberg argued that appellate counsel was ineffective when she failed to

argue that he was denied his right to a trial be twelve jurors and was prejudiced by a rushed

verdict as a result of the illness of one juror. See id.; Coram Nobis Memo. He cited the

applicable provision of the New York State Constitution, statutes and numerous applicable New

York state court cases. See id.; Coram Nobis Reply Memo.

With reference to his communications with appellate counsel about this issue, Goldberg

wrote:

> After the petitioner learned that [counsel] was assigned to represent him
> on his appeal, the petitioner immediately wrote a letter to his new attorney
> outlining the issues which he felt were strongest and needed to be advanced on his
> appeal. The petitioner strongly emphasized the fact that he was denied a fair trial
> by an incident in which a juror became during the deliberations, and after two in-
> camera inquiries in which the juror made it known that he could not continue, he
> was for all practical purposes forced to continue deliberating, which led to rushed
> deliberations.
>
> The petitioner, in his attempt to help develop these issues, also had his
> family contact [appellate counsel and send her a money order to pay for the trial

transcripts so that as soon as she got them she could send them to him. Nevertheless, after writing the petitioner on March 12, 1999, to inform him that she had not yet received the transcribed minutes, on April 14, 1999, the petitioner received the already submitted brief with a copy of the transcripts. [Counsel] did not inform the petitioner of his opportunity to submit a Pro Se Supplemental brief.

[Counsel] also rejected the issue of the ill-juror, stating in the letter she sent along with the already submitted brief and the trial minutes, that the issue was unpreserved and without merit.

Id. at 1-2. The letters to Appellate counsel referred to above were received in evidence at the hearing before this court. See infra section II.F.1.

By Decision and Order dated September 18, 2000, the Appellate Division denied Goldberg's application:

Application by the appellant for a writ of error coram nobis to vacate, on the ground of ineffective assistance of appellate counsel, a decision and order of this court dated November 22, 1999 (People v Goldberg, 266 AD2d 470), affirming a judgment of the County Court, Nassau County, rendered July 20, 1998.

ORDERED that the application is denied.

The appellant has "has failed to establish that he was denied effective assistance of appellate counsel (see, Jones v Barnes, 463 US 745).

Decision and Order of Appellate Division dated September 18, 2000, attached as Exhibit XI to Resp. Fed. Habeas Br.

## C. *First Round of State Court Collateral Challenges*

Goldberg then moved, in the state trial court, alleging that he was denied effective assistance of trial counsel. See N.Y. Crim. Proc. Law § 440.10. He argued that trial counsel was ineffective in two respects: (1) counsel failed to inform Goldberg about the particulars of a plea offer made by the prosecution following a mistrial and before the second trial; and (2) counsel failed to informed Goldberg of the sentence exposure upon conviction—but told Goldberg that it

was his opinion the sentencing judge would, upon conviction, sentence him to no more than ten

years. See Goldberg's Motion to Vacate Sentence at vi, attached as Exhibit XII to Resp. Fed.

Habeas Br. In the accompanying affidavit, Goldberg stated:

> 5. I hereby contend that I was denied my State and Federal Constitutional rights to effective assistance of counsel due to the failure of my trial attorney . . . to relay to me the specifics of a plea offer made by the Assistant District Attorney, Mr. Wayne Kiernan. [Trial counsel] made me aware of a plea that was offered before the 1st trial, which I rejected. After the 1st trial ended in a mistrial and before the second trial, [trial counsel] came to see me and mentioned that a "new deal" had been presented to him. When I inquired of the specifics, [counsel] did not inform me at all of the details of the offer. He did not at any time after that tell me the offer that had been made to me, nor did he counsel me at all with regards to the desirability of accepting or rejecting that plea offer.
>
> Further, when [counsel] informed me of the plea offer before the first trial, he told me the offer was for a 7 year sentence. When I asked what I would get if I lost at trial, [counsel] told me that the [trial judge] was a "very fair judge" and that I would not get more than 10 years. At no time then or thereafter did [counsel] inform me that I could be exposed to a 16 year or more sentence of imprisonment.
>
> If [counsel] would have correctly counseled me . . . that I could receive up to the 25 year maximum after trial for the first degree robbery charge, and had [counsel] relayed to me the "new deal" which was obviously more desirable than the offer before the first trial, I would have accepted the offer to plea and would not have gone to trial a second time.

Id. at iv.

In response, the district attorneys office's affirmation noted that:

> The files of the District Attorney's office indicate that prior to this first trial, defendant was offered a "C" felony in satisfaction of the indictment with no sentence recommendation and that defendant rejected this offer. There is no indication in the file that defendant was made any offer subsequent to the first trial.

See Affirmation of Assistant District Attorney Cara Brady at ¶ 4 n. 1 (emphasis in original),

attached as Exhibit XIII to Resp. Fed. Habeas Br. The district attorney's office argued that the

"motion should be denied because it is based only on his own unsubstantiated factual allegations and there is no reasonable possibility that they are true." See id. at ¶ 10.

By Order dated March 20, 2001, the trial court held Goldberg's motion in abeyance and provided the district attorney's office with an opportunity to submit an affirmation of the trial assistant disclosing any plea negotiations which took place following the mistrial. See Order dated March 20, 2001, attached as Exhibit XV to Resp. Fed. Habeas Br. The court noted:

> Defendant . . . alleges that subsequent to the first trial his attorney informed him that a "new deal" had been proposed, but that his attorney failed to advise him as to "the specifics" of the purported new offer. Although the [government] asserts that there is no reasonable possibility that defendant's allegations are true, they do not explicitly deny that there was a new plea offer after the first trial. Rather, the [government's] affirmation in opposition states only that, "There is no indication in the file that defendant was made any offer subsequent to the trial."

Id. at 1-2.

In response to the court's order, the district attorney's office furnished affidavits from: Fred B. Klein, the then-chief of the Major Offense Bureau, and Wayne Kiernan, the trial assistant who tried both cases—the first resulting in a mistrial and second in a conviction. See Affidavits of Fred Klein ("Klein Aff.") and Wayne Kiernan ("Kiernan Aff."), attached as Exhibit XVI to Resp. Fed. Habeas Br. Kiernan stated that it was his practice to record all plea offers in the case file, that he had reviewed the file in Goldberg's case, and that there was no indication that he offered Goldberg a plea after the first trial. See Kiernan Aff. at ¶ 4. He stated:

> 4. . . . Prior to the first trial, I offered defendant a plea to a "C" felony in satisfaction of the entire indictment and agreed to make no sentencing recommendation to the Court. Defendant rejected his offer. The first trial resulted in a hung jury. The jury was originally split eleven to one in favor of conviction until one juror was replaced due to illness. When the jury remained split ten to two in favor of conviction, the court declared a mistrial.
>
> 5. I have no recollection of offering defendant any plea after the first trial. Furthermore, it was my practice to record all plea offers in the file and

there is no indication in the file that I conveyed a plea offer to defendant after the first trial.

6. Moreover, before I could have made defendant a plea offer following the first trial, I would have had to have received authorization from the Bureau Chief of the Major Offense Bureau, Fred Klein. There is no indication in the file that I sought or received this authorization.

7. Based on my independent recollection and review of the District Attorney's file, it is my belief that I did not convey any plea offer to defendant after the first trial.

Kiernan Aff. at ¶¶ 4-7.

By Order dated April 17, 2001, the court found: "it appears to the court that defendant's claim that his attorney did not advise him of a plea offer is made solely by the defendant, is unsupported by any other evidence, and there is no reasonable possibility that defendant's allegation is true." See Order dated April 17, 2001 at 2, attached as Exhibit XVII to Resp. Fed. Habeas Br. As to Goldberg's claim that trial counsel failed to advise him of the maximum sentence, the court held that "failure to advise a defendant as to the maximum authorized sentence is not, in and of itself, ineffective assistance of counsel." Id. (citing New York v. Cave, 718 N.Y.S.2d 677 (N.Y. App. Div. 4th Dep't 2000); New York v. Modica, 476 N.E.2d 330 (N.Y. 1985)). The court also noted that since Goldberg was not sentenced to the maximum term of imprisonment authorized, he would not have been prejudiced by counsel's failure to inform him of the maximum sentence exposure. Id.

## D.    *Initiation of Federal Habeas Proceedings*

In December 2001, Goldberg filed a pro se petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the Eastern District of New York. See Goldberg's Habeas Petition dated December 12, 2001 ("Original Habeas Pet."), Docket Entry No. 1. Goldberg made two claims:

27

(1) he "was denied effective assistance of [appellate] counsel on his first appeal as a right"; and

(2) his "trial counsel was ineffective for grossly misrepresenting his maximum sentence exposure." See id. at 5-6. Goldberg's petition was accompanied by a thirty-six page memorandum of law thoroughly discussing his bases for relief. See Goldberg's Memorandum of Law Accompanying Original Habeas Pet., Docket Entry No. 2.

On January 4, 2002, this court ordered the respondent to show cause why a writ of habeas corpus should not be issued. See Order to Show Cause dated Jan. 4, 2002, Docket Entry No. 5. By letter dated February 14, 2002, the district attorney's office informed the court:

> While reviewing the file to prepare an answer to the petition, I discovered an error in the affirmations submitted by the District Attorney's Office to the state court in connection with the petitioner's motion to vacate the judgment of conviction that is the subject of the federal writ application. As a result of that discovery, I submitted a "Supplemental Affirmation" to the state trial court and requested that the decision on the motion to vacate the judgment of conviction be reconsidered. A copy of that affirmation is enclosed for Your Honor's consideration. The error, which I have now corrected with the state court, relates to an issue raised in petitioner's application for a federal writ of habeas corpus. Reconsideration of the state court motion could render the federal writ application moot. In any event, the request for reconsideration must be decided before petitioner's state court remedies can be deemed exhausted.
>
> Therefore, this letter is submitted to inform the Court of the proceedings pending in the state court and to request that the petition for a writ of habeas corpus be held in abeyance pending the determination of petitioner's state court motion. I will promptly inform this Court of the outcome of the state court proceedings.

See Letter dated Feb. 14, 2002, Docket Entry No. 12.

The supplemental affirmation, which was attached to the letter, had been filed by assistant district attorney Karen Weiss in the state trial court which had originally denied Goldberg's motion to vacate his conviction. The letter indicated that in fact a plea had been offered before the second trial:

28

7. Recently, defendant filed a petition for a federal writ of habeas corpus in the United States District Court for the Eastern District of New York in which he claims, among other things, that his trial attorney was ineffective because he failed to advise him of the details of a plea bargain offer made by the District Attorney's Office after the first trial. Upon reviewing the file for the purpose of answering the petition, your affirmant found a document, commonly referred to as a "yellow card," indicating that a plea bargain was offered to defendant following the first trial. A copy of that yellow card is appended to this affirmation. The Court's attention is directed to the entries dated March 9, 1998 (two entries) and June 19, 1998. Those entries indicate that, after the first trial, the District Attorney's Office re-offered a plea to a 'C' felony, with a recommendation of the minimum legal sentence—seven years. The District Attorney's file contains also another "yellow card," predating the card upon which the post-trial plea offer was noted. The first card reflects a pre-trial plea offer of a 'C' felony with "no position" on sentence. A copy of the first card is also appended to this affirmation. Therefore, this affirmation is submitted to correct the error contained in the prior affirmations and to request that defendant's motion be reconsidered in light of the correct information.

See id. (attachment).

On February 19, 2002, this court granted respondent's application to hold Goldberg's petition in abeyance. See Order dated Feb. 19, 2002, Docket Entry No. 12-1. It requested that counsel inform the court monthly as to the status of the state court proceedings. Id.

## E. Second Round of State Collateral Challenges

### 1. Initial Proceedings at Trial Level

Because of the supplement affirmation filed in the state trial court based upon the yellow card discovery, as noted supra section II.D., the trial court judge assigned new counsel to represent Goldberg. See Order dated Oct. 8, 2002 at 1, attached as Exhibit XX to Resp. Fed. Habeas Br. By Order dated October 8, 2002, the court denied Goldberg's motion to vacate the judgment of conviction in all respects and did so without a hearing. See id. On January 9, 2003, Goldberg, through his new counsel, moved for leave to reargue the court's October 8, 2002 decision. See Notice of Motion dated Jan. 9, 2003, attached as XVII to Resp. Fed. Habeas Br.

The court granted the motion to reargue, and upon reargument, denied Goldberg's motion to vacate the judgment of conviction. <u>See</u> Order dated Jan. 24, 2003, attached as XXI to Resp. Fed. Habeas Br.

2.    *Appellate Proceedings*

Goldberg sought leave to appeal the January 24, 2003 order; leave to appeal was granted by the Appellate Division. <u>See</u> Decision, Order, and Certificate Granting Leave to Appeal on Motion, attached as Exhibit XXIV to Resp. Fed. Habeas Br. He filed a well-written pro se brief and reply brief in the Appellate Division. <u>See</u> Goldberg's Appellate Brief on Collateral Attack, attached as XXV to Resp. Fed. Habeas Br.; Goldberg's Appellate Reply Brief on Collateral Attack, attached as XXVI to Resp. Fed. Habeas Br.

On October 31, 2006, the Appellate Division ordered an evidentiary hearing:

> To prevail on a claim of ineffective assistance of counsel based upon the defense counsel's failure to advise the defendant with respect to an offer of a plea agreement, a defendant must demonstrate " 'that a plea offer was made, that defense counsel failed to inform him [or her] of that offer, and that he [or she] would have been willing to accept the offer' " (<u>People v. Fernandez</u>, 5 N.Y.3d 813, quoting <u>People v. Rogers</u>, 8 A.D.3d 888, 890-891). A defendant's self-serving statement, without more, is insufficient to establish such a claim (<u>see</u> <u>People v. Fernandez</u>, <u>supra</u>; <u>People v. Rogers</u>, <u>supra</u>).
>
> In the instant case, it is undisputed that the People made an offer of a plea agreement involving a sentence of imprisonment of seven years. There are notes in the People's file indicating that, after the first trial, an offer was made and rejected by the defense counsel "out of hand." Based upon those file notes and the appellant's statements, there are questions of fact as to whether the defense counsel conveyed the terms of that offer to the defendant and, if so, whether the defendant would have accepted it.
>
> In view of the foregoing, a hearing was warranted.

<u>New York v. Goldberg</u>, 823 N.Y.S.2d 492, 493 (N.Y. App. Div. 2d Dep't 2006).

*3.    Evidentiary Hearing*

Pursuant to the order of the Appellate Division, an evidentiary hearing was held by the

state trial court on January 16, 17 and 19, 2007. See State Evid. Hr. Testimony was taken from

Goldberg, Kiernan (the assistant district attorney who tried both cases), Klein (Kiernan's Bureau

Chief), and Goldberg's trial counsel for both trials. Id. Goldberg proceeded pro se with his

assigned new counsel acting as a stand by attorney. See Decision and Order dated April 9, 2007

at 4.

At the hearing, Goldberg conducted a thorough and effective examination of his original

trial counsel who did not testify to any significant events because of lack of memory. The trial

court's opinion accurately describes this hearing:

> [T]he attorney who represented the defendant on the trial which resulted in
> a mistrial as well as the trial which resulted in conviction testified at the hearing.
> He had no independent recollection of a discussion with the defendant or with the
> trial assistant regarding any plea offer including a class C violent felony with a
> recommendation of the minimum sentence of seven years. [Trial counsel] also
> had no independent recollection of discussing the defendant's maximum sentence
> upon conviction with him. A review of his file did not refresh his recollection as
> to any relevant issue. Regrettably, [trial counsel] testified that the administrative
> section of his file was not located, although he had the trial portion.
>
> Trial counsel did testify as to his recollection of spending a significant
> amount of time speaking with Goldberg and members of the Goldberg family
> concerning many issues related to the case.
>
> Trial counsel negated the possibility of his rejection of the offer in issue
> without communicating it to Goldberg. He testified that he had never rejected a
> plea offer without first consulting with his client.
>
> The attorney further testified that although he had no immediate
> recollection of discussing the maximum sentence upon conviction with Goldberg,
> there had never been a time in his career when he did not inform his client of his
> maximum sentence exposure.
>
> Each representative of the District Attorney's office testified as to having
> no independent recollection of the circumstances surrounding any plea offer

31

extended to the defendant during the period between the first and second trial. The trial assistant, however, confirmed that the "yellow cards" were in his handwriting and clearly indicated that an offer of a plea to a C violent felony in satisfaction of the indictment, with the office of the District Attorney taking no position regarding sentence, was extended to the defendant prior to the first trial. The "yellow cards" also relate that between the mistrial and the commencement of the second trial, a plea offer of a plea to a C violent felony in satisfaction of the indictment with a recommendation of seven years was communicated to the attorney for the defendant and "rejected out of hand."

The defendant testified under oath and thereafter presented argument in support of his motion.

The substance of the defendant's testimony was that prior to the first trial, he was aware of a plea offer permitting him to plead guilty to a class C violent felony in satisfaction of the indictment and receive a sentence of seven years; that he refused that offer and instructed his attorney to proceed to trial; and, that, at his first trial, aware of the jury's eleven (11) to one (1) vote for conviction, gleaned from a jury note, he instructed his attorney to substitute an alternate juror to replace an ill juror rather than force a mistrial. He further testified that following the first trial he was informed by his attorney that there was a new plea offer, however, he was not told, nor did he press for, the particulars of the new plea offer; that his attorney told him that he believed that [the trial] Judge . . . was a fair judge and upon conviction would probably sentence him to no more than ten years; and, the defendant stated that he was unaware that he was facing maximum exposure, upon conviction, of twenty five (25) years.

It was established at the hearing that the defendant had received some college level education, having started at Holy Cross College in Worcester, Massachusetts and thereafter transferring to Southern Connecticut State University. Moreover, he testified as to having some experience with the criminal justice system, resulting from previously being charged with robbery.

In addition, the defendant presents and impresses as a very articulate and intelligent man, whose pro se papers were cogent and artfully drawn.

See Decision and Order dated April 9, 2007 at 4-6.

*4. Trial Court's Decision*

By decision and order dated April 9, 2007, the trial court found that Goldberg had not

been denied effective assistance of trial counsel. Id. 10. Since this is the last state court opinion

addressing Goldberg's claim of ineffective assistance of trial counsel, it is set out in full:

> "The right to the effective assistance of counsel is guaranteed by both the Federal and State constitutions (US Const., 6th Amdt; NY Const., art I, § 6).
>
> An attorney provides effective assistance to his client "[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met." People v Baldi, 54 NY 2d 137, 147[1987]).
>
> A defendant who moves pursuant to CPL § 440.10 to vacate the judgment of conviction has the burden, at a hearing, to prove "by a preponderance of the evidence, every fact essential to support the motion" (CPL § 440.30(6)).
>
> Where the motion is grounded on a claim that he was ineffectively represented by counsel, resulting from counsel's failure to inform him of a specific plea offer, he has the burden of showing that a plea offer was in fact made; that counsel failed to inform him of the offer; and, that he would have been willing to accept the offer. (See People v Rogers, 8 AD 3rd 888 [3[rd] Dept. 2004]).
>
> This Court credits the substance of the records consisting of the two "yellow cards", moved into evidence without objection, to the extent that it finds that a plea offer consisting of an opportunity to plead guilty to a class C violent felony in satisfaction of the indictment and with the assurance that the People would take no position on the occasion of sentence was in fact approved by the Nassau County District Attorney's Office prior to the commencement of the first trial. The Court further finds that some time between the mistrial and the commencement of the second trial, the Nassau Country District Attorney's Office extended to defense counsel, as offer permitting the defendant to enter a plea of guilty to a class C violent felony, along with a recommendation from the District Attorney that the defendant receive the minimum, seven years.
>
> The defendant's claim, however, that the plea offer advanced following the mistrial and prior to the commencement of the second trial was not conveyed to him, was not sustained by the evidence adduced at the hearing. Throughout the defendant's testimony, he repeated on several occasions that he was aware of, and rejected, a plea offer involving a plea to a C felony and a sentence recommendation of seven years. He claimed, however, that this offer was made

33

and rejected by himself prior to the first trial. This scenario, however, is contradicted by the entries on the "yellow cards."

The defendant testified at the hearing that his attorney visited him at the Nassau County Correctional Center following the mistrial and prior to the commencement of the second trial, and indicated to him that the District Attorney had advanced a "new offer" bud did not convey the sentence recommendation component. [Trial counsel's omission of this simple but significant component of the new offer on the occasion of the jail visit, as well as on other occasions, is highly unlikely and is contradicted by the attorney's testimony. [Counsel] testified that he has never rejected a plea offer on behalf of a client without communicating it to the client.

Similarly, the defendant's claim that he was not made aware of the maximum sentence exposure, upon conviction, throughout the near completion of two trials, as well as the trial and sentence preparation periods, is not likely. [Trial counsel] represented the defendant from the outset and testified to meetings with the defendant, as well as family members. It is equally unlikely that discussions concerning alternatives to trial did not occur on these occasions Moreover, this Court credits [counsel's] testimony to the effect that there had never been a time that he did not discuss with a criminal client the client's maximum exposure.

In any event, it is the defendant's burden, not only to show that plea offer was made and communicated to him, but to show that he would have, in fact, accepted the plea and forgone his trial. The defendant's testimony belies the position that he would have accepted the plea to a class C violent felony and a recommendation of a seven year sentence. The defendant, in summing up to the Court, indicated that "[Counsel] came to after the first trial, . . . he said that there was a new offer extended by the [prosecutor]. I asked [counsel], I said what's the terms? That's when [trial counsel] did not convey the terms of the plea offer, but he, rather said, you're thinking about taking a plea? I said, I don't know". (hearing transcript p. 206) Moreover, the defendant testified at the hearing that he turned down the class C felony with a seven year sentence prior to the first trial. He further testified that during the course of deliberations at the first trial, he became aware, through a jury note, that the jury was deadlocked, with a vote of eleven (11) to one (1) favoring conviction. The defendant, armed with that information, shortly thereafter, consented to a substitution of a juror rather than instructing this attorney to move for a mistrial. The Court considers such conduct reaffirmance of this defendant's unwillingness to give up his right to a trial in favor of a reduced plea or a mistrial.

This Court finds that the defendant has failed to substantiate a claim that if he were in fact informed of the opportunity to dispose of the matter with a plea to a class C violent felony, along with a recommendation of a seven years

determinate term, he would have accepted it. (See People v. Fernandez, 5NY3d 813[2005])

> Accordingly, the defendant has not been denied effective assistance of counsel, and his motion to vacate the conviction pursuant to CPL § 440.10 is denied in all respects.

Id. at 7-10.

5.    *Leave to Appeal*

By affidavit dated April 25, 2007, Goldberg sought leave to appeal the trial court's April, 9, 2007 order to the Appellate Division. See Goldberg's Affidavit in Support of Leave to Appeal dated April 25, 2007, attached as Exhibit XXXI to Resp. Fed. Habeas Br. The Appellate Division denied his application on June 2, 2007. See Decision & Order dated June 2, 2007, attached Exhibit XXXIII to Resp. Fed. Habeas Br.

## F.    ***Return to Federal Habeas Court After Exhaustion of State Remedies***

1.    *Reopening of Federal Habeas Proceedings*

From March 2002 to July 2003, the district attorney's office informed this court of the status of the pending state court proceedings as outlined supra section II.E. See Docket Entry Nos. 13-27. On April 25, 2003, the case was reassigned to the undersigned judge as part of the consolidation of this district's habeas docket. See Docket Entry dated April 25, 2003.

In July 2003, this court vacated the earlier order requiring the district attorney's office to provide monthly status reports and administratively closed the case until a party moved to restore the matter. See supra section II.D. (discussing initiation of federal habeas proceedings); Order dated Feb. 19, 2002 (requiring monthly status reports); Order dated July 31, 2003, Docket Entry No. 26 (vacating the Feb. 19, 2002 order and administratively closing the case).

By letter dated July 16, 2007, Goldberg wrote to this court:

Please find enclosed an original and two copies of an amended petition for a writ of habeas corpus, as well as an original and two copies of a supporting memorandum of law. The initial habeas petition was filed in this Court on December 17, 2001. However, in February 2002, the People discovered new evidence pertaining to a motion to vacate judgment whose denial was subject of a claim raised in the instant petition, so the People moved this Court to hold the habeas petition in abeyance and the trial court to reconsider the motion. After well over five years of litigating that particular claim in the state court, including three denials by the trial court and an Appellate Division decision reversing one of the trial court's summary denials, the claim underlying the motion to vacate judgment has been fully exhausted.

I learned on June 20, 2007 that on June 12, 2007 the Appellate Division, Second Department denied me leave to appeal the trial court's latest denial of the motion. Thus, this amended petition is being submitted to reopen the Federal habeas corpus proceedings within 30 days of my learning that the claim was fully exhausted. . . . Please accept the enclosed paperwork as timely, and if any further submissions are necessary, kindly let me know. Thank you.

Letter dated July 16, 2007, Docket Entry No. 28. The letter was accompanied by Goldberg's amendments to his original habeas petition dated December 12, 2001 and a fifty-two page pro se memorandum of law. See Goldberg's Amendment's to Original Habeas Petition dated July 16, 2007 ("Amend. Habeas Pet."), Docket Entry No. 29; Goldberg's Memorandum of Law in Support of Habeas Petition ("Pet. Memo."), Docket Entry No. 30.

Goldberg's amendments to the original habeas petition reflect the state developments. The second ground of the original habeas petition was amended to read as follows: "Defense counsel was ineffective for failing to convey the terms of a plea offer to the petitioner, failing to advise the petitioner concerning whether he should consider accepting the plea offer, and grossly misrepresenting the petitioner's sentence exposure." See Amend. Habeas Pet. at 2.

On August 2, 2007, this court issued the following order:

Petitioner's submission received July 18, 2007, is accepted for filing without any ruling on timeliness. The case is to be restored to the active calendar. The Magistrate Judge is to appoint counsel to represent the petitioner. The respondent is to respond to petitioner's July 18th submission within sixty days.

An evidentiary hearing shall be held on October 24th at 10:00 a.m. The warden is to have the petitioner available via telephone to participate at the hearing. Trial and appellate counsel shall appear in court or by telephone if personal appearance is not practicable. The parties are to exchange names of witnesses and summaries of their testimony and other evidence by October 1st at 10:00 a.m.

Order dated August 2, 2007, Docket Entry No. 32.

2.    *Appointment of Counsel and Discovery*

Counsel was appointed on August 8, 2007. See Order dated Aug. 8, 2007, Docket Entry

No. 34. By letter-motion dated September 11, 2007, Goldberg—by his appointed attorney—

sought issuance of a subpoena and subpoena duces tecum pursuant to Rule 6(a) of the Rules

Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"). See Letter

dated Sept. 11, 2007, Docket Entry No. 35. He also sought production of trial transcripts and

appellate briefs from the district attorney's office. Id. at 1. He also contended:

> Trial counsel . . . testified at a state court hearing that he did not have the so-called administrative part of his file. Whatever is in his file should be produced as relevant to [counsel's] knowledge of the plea bargain which the prosecutor made. His file should reflect meetings with the defendant and the prosecutor during the relevant period in March 1998, particularly because [counsel] was assigned counsel and had to submit time records to the Assigned Counsel Plan (New York County Law 18B) to justify his fee requests. [counsel's] calender [sic] entries for March 1998 may reflect these meetings. In addition, [counsel's] correspondence with the prosecutor may reflect [counsel's] prior statements and those of the prosecutor to him about the plea offer in question.

> Appellate counsel . . . presumably has a file reflecting her own correspondence with Darrin Goldberg and his request that she raise the appellate issue which is the subject of this petition. [Appellate counsel's] file papers will show whether she conducted legal research concerning the viability of the appellate issue in question. Like trial counsel, appellate counsel assigned pursuant to County Law 18B must submit billing records to the Assigned Counsel Plan for payment which should reflect her work for Mr. Goldberg. These specific allegations provide the Court with reason to believe Mr. Goldberg can use the requested documents to develop facts to demonstrate that he is entitled to relief.

> In sum, the Respondent is expected to call these two lawyers on its case-in-chief on October 24, 2007. It is entirely reasonable for Petitioner's counsel to

37

examine the lawyers' files, including their billing records, in preparation for the hearing. I enclose the proposed subpoenas which call for counsel to appear at the hearing and to produce the documents in question.

Id. at 2 (citations omitted). The letter was accompanied by proposed subpoenas for Goldberg's

state trial and appellate counsel. Id. (enclosures).

3.      *Objection to Evidentiary Hearing*

        By letter dated September 12, 2007, the district attorney's office objected to the court

ordered evidentiary hearing:

> At the time of the issuance of the August 2 order, the Court may have been unaware that a full evidentiary hearing on the very issue raised by petitioner (state trial counsel's alleged failure to fully inform petitioner of a plea offer) had already been conducted in state court. Any further hearing on this issue at this time would be premature and improper unless and until this Court determines that the state hearing was somehow inadequate. 28 U.S.C. 2254(e)(2).
>
> Any such finding would of course be anomalous in that defendant does not even allege any impairment in his ability to develop the facts in the state court. Indeed, in his petition, petitioner repeatedly relies on that hearing to support his claim. It follows that any discovery for a possible evidentiary hearing is also premature. Accordingly, I respectfully request that the October 24 date be reserved for a conference, and that the possible need for an evidentiary hearing be determined at that time.
>
> In sum, this Court should not order any evidentiary hearing (or grant any discovery) unless it finds some infirmity in the state court hearing. Moreover, at the present time, this Court should decline, without prejudice, petitioner's request for subpoenas to prior counsel, at least one of whom (trial counsel . . . ) has already testified at the state hearing.

Letter dated Sept. 12, 2007, Docket Entry No. 36.

        By letter dated September 13, 2007, Goldberg responded to the objection of the district

attorney's office. See Letter dated Sept. 13, 2007, Docket Entry No. 37. Goldberg termed the

district attorney's objection to the court-ordered evidentiary hearing as a motion to reargue,

38

which, he urged, was untimely by thirty days pursuant to Local Civil Rule 6.3. Id. at 1.

Goldberg further argued:

> In any event, Rule 8 of the [Habeas Rules] . . . gives the Court broad discretion to order such evidentiary hearings. Mr. Goldberg has diligently sought to develop the factual basis underlying his habeas petition and yet the state court hearings were inadequate to give this Court the full factual basis for the petition.
>
> Respondent has suggested that "at least one" of Goldberg's prior counsel testified in state court. Yet, Respondent is well-aware that prior [appellate] counsel . . . who this Court has ordered to give evidence on October 24, 2007— was not a witness at the hearing. Mr. Goldberg represented himself at the state court hearing but will have appointed counsel at the upcoming hearing who can help develop the record. The Court that will decide the issues should have the opportunity to ask its own questions of the purportedly ineffective lawyers so as to satisfy itself as to their credibility and to weigh their explanations for their services to the petitioner.

Id. at 2.

On September 12, 2007, the court issued another order requiring participation at the forthcoming hearing of Goldberg's state court trial and appellate counsel. See Order dated Sept. 12, Docket Entry No. 38. The order again noted that "[p]etitioner shall participate at the hearing via telephone." Id.

By order dated September 14, 2007, the court held: "Respondent's September 12, 2007[] letter has been received. [T]he hearing . . . will proceed as ordered unless petitioner waives it." See Order dated Sept. 14, 2007, Docket Entry No. 39. The court signed the proposed subpoenas submitted by Goldberg's habeas attorney on September 17, 2007. See Order dated Sept. 17, 2007, Docket Entry No. 40.

4.    *October 24, 2007 Evidentiary Hearing*

An evidentiary hearing was held on October 24, 2007. See Tr. Fed. Habeas Hr. The state court evidentiary hearing had focused on Goldberg's claim of ineffective assistance of trial

39

counsel; the ineffective assistance of appellate counsel claim had already been factually and legally exhausted due to the denial of the coram nobis application. See supra section II.E.3 (state evidentiary hearing); supra section II.B.2 (ineffective assistance of appellate counsel). The federal hearing covered the assistance of both trial and appellate counsel. As to the evidence related to the ineffective assistance of trial counsel claim, the testimony at the evidentiary hearing in this court is wholly consistent with the factual findings by the state court.

Participating in this hearing was Goldberg's state appellate counsel; Wayne Kiernan (assistant district attorney who prosecuted both state court trials); Goldberg's state trial counsel in both trials; Darrin Goldberg (petitioner) by telephone; Goldberg's federal habeas attorney; and Douglas Noll and Andrew Fukuda (respondent's attorneys). Kiernan, state trial counsel and Goldberg participated via telephone.

a.      State Appellate Defense Counsel

State appellate defense counsel's testimony is relevant to Goldberg's ineffective assistance of appellate counsel claim. She testified that she has argued about 250 appeals over the course of her twenty-one year legal career. See id. at 20. On October 28, 1998, she had been appointed by the Appellate Division to represent Goldberg. Id. at 5; see also Petitioner's Federal Habeas Hearing Exhibit ("Pet. Fed. Habeas Hr. Ex.") 4 (order of assignment by the appellate division assigning appellate counsel to represent Goldberg).

On November 16, 1998, appellate counsel wrote to Goldberg informing him of her assignment and asking him if "there are any particular issues that [he] . . . would like to bring to the court's attention." See Pet. Fed. Habeas Hr. Ex. 5; Tr. Fed. Habeas Hr. at 5-6. Goldberg responded by informing her about the circumstantial fingerprint evidence and lack of eyewitness

identification during the trial.  See Letter [undated] at 2-4, Pet. Fed. Habeas Hr. Ex. 6 & 6A.  He

also informed his appellate counsel about two issues which he thought merited an appeal, use of

an alternate juror at the first trial, and the asthma attack of a juror at second trial:

> In terms of appealable issues, . . .
>
> [1] [M]y 1st trial, after an entire day of deliberating a woman on the jury had an asthma attack and was taken to the hospital.  I was given a choice of a mistrial or selecting an alternate juror and I chose the alternate juror which ultimately led to a hung jury.  In the 2nd trial, after few hours of deliberating, one of the male jurors came up to the courtroom and explained to the judge that he was experiencing difficulties from asthma.  He specifically told the judge he was not deliberating or contributing to the deliberation at all.  He asked . . . [the] Judge . . . , if he could be excused from the jury, but the judge told him to try some more.  A few hours later he came up again and said it was worse and that he could not deliberate, but the judge said he would not remove him from the jury but he would dismiss the jury for the day to come back the next day.  The juror told the judge he did not want to inconvenience the rest of the jurors, so the judge told him to try again.  An hour later as the judge was about to dismiss the jury for the night, they reached a guilty verdict.  It is obvious this man did not deliberate.  I do not know if it is an issue but both jurors that were alternates and would have been put in his place were black, whereas the juror was Caucasian.
>
> [2] [M]y trial lawyer also said there may be an issue on a picture of me on the day I was arrested which the prosecutor admitted into evidence.  His reason for admitting my picture in evidence is that between the time I was arrested for this crime, November 25, 1997, until the trial, June 10, [19]98, I lost some weight, so he wanted to show a picture of my face with more weight.  When I was arrested I was 6ft. 3 inches and 205 pounds, whereas in the trial I was at about 190 lbs.  My lawyer said that admitting that picture was not right.

See id. at 4-5.

State appellate counsel acknowledged Goldberg's letter on December 19, 1998.  See

Letter dated Dec. 19, 1998 at 2-4, Pet. Fed. Habeas Hr. Ex. 7; Tr. Fed. Habeas Hr. at 7.  By letter

dated April 14, 1999, after the appeal had been filed, defendant's appellate counsel advised

Goldberg that she did not raise either of the issues he had requested her to raise on direct appeal:

> Enclosed herewith please find the brief that I have filed on your behalf and the trial transcript.  While the court will not reimburse me for the transcript copy,

your fiancé has assured me that she will reimburse my local copy shop, by a money order payable directly to the shop, for the copying of the minutes. I firmly agree with your arguments on the issue of the legal sufficiency of the conviction but, as I explained to your fiance [sic], appellate courts are often reluctant to overturn a jury's verdict.

As to the issue of the arrest photo and the deliberations, I did not include them because they were unpreserved, meaning that your attorney did not object to them. I do not think this was any sign of a failing on [trial counsel's] part. To the contrary, he did a compelling job here despite the verdict. Also, with regard to the photo, I believe that the prosecution had the right to show a change in appearance because weight was a significant part of Halligan's description. Also, with regard to the deliberations, I did not think that the record showed that the juror was pressured into a verdict. To argue such would have been speculation and, I felt, would have weakened the brief.

I welcome your comments.

See Letter dated April 14, 1999 ("April 14 letter"), Pet. Fed. Habeas Hr. Ex. 8; Tr. Fed. Habeas Hr. at 8-9.

Appellate counsel testified that it took her two weeks to complete Goldberg's appellate brief and that she did not believe that the ill juror issue that Goldberg wanted her to raise on appeal was preserved for appellate review. Id. at 27 (time took to prepare brief); id. at 20 (ill juror issue unpreserved). As to informing Goldberg about her position on the ill juror issue, upon questioning from Goldberg's habeas attorney, appellate counsel testified:

Q. Did you ever tell Mr. Goldberg that you did not intend to raise the issue that he wanted to raise, prior to the time you filed the brief?

A. I don't know. I know I spoke to his father in that time and his fiancé at that time . . . . What was the content of those verbal discussions, I honestly can't say. I know I spoke to the family, I know I spoke to [trial counsel] twice.

. . . .

Q. [Referring to the April 14 letter,] [S]o this is your first notice that you're sending to him of this; is that correct?

A. Yes.

Q. And if you had told him earlier, he might have been able to raise this issue in a pro se brief; is that correct?

A. Right. And that is the one thing that I think, if you say to me—this is ten years of practice since I did this—what would I do differently? And in those subsequent years, I have become much more proactive about saying, I don't think this is really something I want to raise but you retain the right and I'm happy—in the federal courts, where I now do most of my work, I must bring a motion.

Id. at 28-29.

She also responded: "[a]s a seasoned appellate counsel, I can tell you that most defendants want to see every issue they suggest . . . [be raised]. Rare is the client who writes to you and says, you went to law school, I didn't; you be the expert and do what you want, in fairness." Id. at 42.

Appellate counsel raised two claims on direct appeal: (1) that the circumstantial fingerprint evidence was legally insufficient to prove guilt beyond a reasonable doubt; and (2) the verdict was against the weight of the evidence. Id. at 44. According to appellate counsel these claims were the strongest because the jury in the first trial, which had ended in a mistrial, was not convinced the evidence sufficed, and the prosecution's case in the second trial was not different from that the at first. Id. at 29-30. She concluded:

It bothered me. The description of the perpetrator for the second person that was alleged to be my client was off, and it was significantly off. And the complainant, after—there was fair amount of contact between the complainant and the perpetrators—couldn't make an [identification]. And really all that pinned [Goldberg] were these [finger]prints on the tape. That's all there was. It bothered me.

Id. at 30. Appellate counsel believed that the ill juror claim was unpreserved for appellate review and a weak issue to argue on appeal. Id. at 29. Her judgment that the issue was unpreserved was described as follows:

> My recollection of this [trial] record was that [trial counsel] was the type of attorney that, when something was important to him, he talked about it, and he didn't stop talking about it. That's my recollection of this. And I remember I spoke to [trial counsel] twice in the course of this, once early on, because the client's family was very interested that I speak to him; and I think once later on. . .
>
> But I don't recall getting the impression that he was actually objecting to this continuation. And maybe if it was a different, meeker trial attorney, I would have felt different. But my recollection from this record is that he was, at least from what was on the record, a fairly vociferous advocate in the courtroom. He had gotten a mistrial the first time. He had a handle on the circumstantial nature of the evidence this time, and I . . . [don't] think[] the issue was preserved.

Id. at 23.

b.   Wayne Kiernan

Kiernan's testimony is relevant to Goldberg's ineffective assistance of trial counsel claim that trial counsel failed to convey a plea offer made by the prosecution. His testimony at the federal evidentiary hearing, based primarily on his recollection as confirmed by the yellow cards, was consistent with his testimony at the state court evidentiary hearing. During Goldberg's trial, the yellow cards were used by the Nassau County District Attorney's Office to preserve case history and to create a record of plea offers made by the prosecution. Id. at 64.

Kiernan's testimony focused on three plea offers made by the district attorney's office to Goldberg. These plea offers were made on: (1) December 8, 1997 (before the first trial); (2) March 9, 1998 (before the second trial); and (3) June 19, 1997 (on the eve of the second trial). At the hearing, Kiernan was instructed to read from the yellow cards which were in his

handwriting. Id. at 70-71. See Pet. Fed. Habeas Hr. Ex. 1; Tr. Fed. Habeas Hr. at 68 (admitting the yellow cards in evidence).

Kiernan testified that the first plea offer of December 8, 1997 was an offer to a class C felony, with the district attorney's office taking no position as to the sentence. Id. at 70-71. That offer was rejected and the case went to trial—eventually resulting in a mistrial. Id.

The second offer, made after the mistrial on March 9, 1998, was an offer to a class C felony, with the district attorney's office recommending to the court that Goldberg be sentenced to the statutory minimum term of seven years imprisonment. Id. at 71. This offer was rejected "out of hand," possibly without any consultation with Goldberg. Id. at 74-75; 87. This offer was withdrawn by the district attorneys office upon rejection. Id. at 74-75.

The third offer was one for a class C felony made by Kiernan on June 19, 1998. Id. at 88. The yellow card does not indicate whether the district attorney's office would have recommended a sentence as part of this offer; Kiernan could not remember. Id. This offer was rejected by his counsel while Goldberg was present. Id. at 76-77. Kiernan also stated that between the March 9 and June 19 offers, Goldberg and his trial counsel "were in contact, because the defendant was in the courtroom," and that trial counsel had the opportunity to communicate with Goldberg about the March 9 plea offer. Id. at 89.

c.    State Trial Counsel

Counsel could not testify about the specifics of the plea offers because of his lack of memory. Id. at 100-02. He testified that since 1998, he has represented two- to five-hundred clients. Id. at 117-18. He stated that although he does not have an independent recollection of

45

telling Goldberg, he was likely to have informed Goldberg about the statutory maximum as part of his usual practice:

> In a case as serious as [this one] . . . , I spent a great deal of time prepping him for the trial, meeting with him and his family, and during the course of that time, I would have explained to him the types of sentences that he was facing should he proceed to trial.

> . . . .

> I always tell my clients what the time is that they're facing at trial and upon plea at all times. It's standard practice. . . .

Id. at 106; see also id. at 120 ("I would be very surprised if I did not engage in lengthy conversations on numerous occasions with Mr. Goldberg with respect to the maximum and minimum periods of incarceration he could receive after trial and prior to trial.").

Although trial counsel did not recall telling Goldberg that he might receive a sentence of ten years upon conviction after trial because the judge was a fair judge, id. at 107, he did state that it would not be unusual for him advise a client about sentencing before a particular judge if asked by the client, id. at 115-16:

> Q.    If you believed that a judge was a fair judge, would that lead you to make a more reasonable or favorable estimation of the amount of time your particular client was facing after trial?

> A.    That would be one factor I would have considered.

Id. at 125.

As to Goldberg's allegation that counsel failed to convey a plea offer to him, trial counsel could not remember the specifics of any plea offers in Goldberg's case. He did testify, however, that it was his "practice to convey all plea bargaining negotiations to clients." Id. at 108.

<u>d.</u>    <u>Darrin Goldberg</u>

Goldberg participated in the hearing via telephone. In the beginning, the court instructed everyone to speak louder when Goldberg informed the court that he had a difficulty in hearing the proceedings. <u>Id.</u> at 1-4. His attorney also ensured that Goldberg was able to fully participate from the onset:

| [Habeas counsel]: | Before I begin, your Honor, can we be assured that if there is any problem with hearing, that Mr. Goldberg will be advised to let us know? |
| --- | --- |
| The Court: | Mr. Goldberg, if you can't hear, speak up. |

<u>Id.</u> at 4. Goldberg did not inform the court thereafter of a problem hearing the proceedings.

At the conclusion of the testimony of each witness, the court cleared the courtroom:

| The Court: | We're going to take a few minutes' break. I'm going to clear the courtroom so that counsel can consult with his client, to see whether the client has any further suggestions on redirect. So we'll all take a ten-minute break. The petitioner will remain on the phone. |
| --- | --- |
| | Do I have somebody on the phone with the petitioner? |
| . . . . | |
| Mr. Goldberg: | Yes. There's someone in the room with me. |
| The Court: | Alright. Tell that person [that] . . . I'm telling you, stay on the phone, even though there's silence. Is that clear? |
| Mr. Goldberg: | Yes. |
| The Court: | Because I want you to consult with your lawyer to see if there's anything else to ask the witness before she leaves. So we're going to leave the courtroom while you consult. Do you understand? |
| Mr. Goldberg: | Yes. |

47

Id. at 53-54 (at the conclusion of appellate counsel's testimony); see also id. at 91 (at the conclusion of Kiernan's testimony); id. at 124-25 (at the conclusion of trial counsel's testimony).

According to Goldberg, he first realized that he was denied effective assistance of trial counsel when he found out about a New York state court case when watching television in November 2000. Id. at 179. The court had held that a lawyer must counsel his client with regard to a possible plea. Id.

> I then read the cases cited therein, and realized that I was clearly denied the effective assistance of counsel was entitled to relief. I immediately wrote to [trial counsel] to explain my intentions, and when I received no reply from him after two months, I submitted the motion to vacate[] judgment. Until [then] . . . I had no idea that [trial counsel's] errors at the plea stage constituted ineffective assistance of counsel and that I was entitled to relief.

Goldberg's Reply Memorandum in Support of Motion to Vacate Sentence at 5, Pet. Fed. Habeas Hr. Ex. 14, attached as Exhibit XIV to Resp. Fed. Habeas Br.

Goldberg admitted that he was aware of the December 8, 1997 plea offer that had been made by the district attorney's office before the first trial. Id. at 128.

> Q.  What was your conversation with [trial counsel immediately after arraignment] . . .?
>
> A.  When he first came to see me, he briefly talked about the case, and it was at that time that he informed me there was a plea offer available for a term of seven years.
>
> Q.  Okay. And did he make any recommendation or tell you anything else about it.
>
> A.  Oh yeah. I asked him, you know, I was very surprised that the offer was so high you know? And I said, why is the offer so high? And he told me because the trial prosecutor was . . . a very difficult person to deal with and that's why the offer was so high. After that I asked him . . . how much time I [would] get if I went to trial? And at that time he told me that the judge was very fair, and he did not see me exceeding more than ten years if I was convicted at the trial.

Tr. Fed. Habeas Hr. at 128.

He contends that trial counsel did not tell him that seven years was the absolute minimum term of imprisonment he could receive upon conviction. Id. This alleged failure on counsel's part allegedly led Goldberg to believe that he could receive less than seven years if convicted after trial—which is why he says he rejected the first plea offer. See Pet. Memo. at 34. Goldberg swore that when he asked his counsel about how much time he would receive upon conviction after a trial, instead of being told about the statutory maximum and minimum, he was informed that he was likely not to receive more than ten years imprisonment because the trial judge was a fair judge. See Tr. Fed. Habeas Hr. at 130. Because of this, Goldberg contends, he believed that a sentence of ten years was the statutory maximum. In fact the statutory maximum was twenty-five years. See Pet. Memo. at 34. As to the reasons why Goldberg rejected this offer:

> [I] think it's important to know that the reason that I rejected the seven-year offer before the first trial, the only reason is because [trial counsel] represented that I would get no more than ten years if convicted at the trial. And even before the second trial, after the mistrial, he never revisited that issue and I was still under the impression that I would only get up to ten years.

> So that my decision to go to trial was very much affected by the fact that I was under the misconception that I would receive ten years. Had I known that I could have gotten up to 25 years, I would have taken the plea offer before the first trial. And there's no doubt about it.

Tr. Fed. Habeas Hr. at 178.

Goldberg's testimony as to the specifics of the December 8, 1997 plea offer is not consistent with Kiernan's testimony and is unsupported by the yellow cards. According to petitioner, this plea offer contained a recommendation for a sentence of seven years by the district attorney's office. Kiernan, however, as noted supra section II.F.4.b, testified that the

49

district attorney's office did not take that position in the December 8, 1997 plea offer; he is supported by the yellow cards.

With regards to the second plea offer of March 9, 1998, Goldberg testified that when trial counsel visited him following the mistrial, his attorney seemed very confident about chances of gaining an acquittal in the second trial and failed to convey the offer:

> [Trial counsel] . . . was telling me about the change and . . . I was expecting skepticism. And [counsel] said to me that the case was weak, had a mistrial and he said at that the people even came to me with a new plea offer. He did say that.

Q.  Well, when you say, he said the people even came to you, was this . . . sort of an explanation as to how weak the case was? What do you think he was getting at?

A.  Right. That's exactly what it was. He was saying this case is weak, look. The people even came to me with a new plea offer. As in, you know, they don't think they can win this case. That's the way I took it.

. . . .

Q.  And how did you respond?

A.  I asked him, I said, what's the offer?

Q.  And . . . how did he respond?

A.  Well, at that point, we were sitting across from each other and [trial counsel] sat back in his chair, and his whole facial position changed, and it appeared that he was somehow you know, disappointed that I was interested. And he said to me, he said, you're thinking of taking a plea offer? And I said, I don't know. And instead of telling me the plea offer, [he] said, listen, I don't want you to start losing heart, I don't want you to get, you know, I don't want you to worry about this; I'm more prepared for this case than I've been for any case before. I'm ready to try this case again. I've seen the evidence and I'm gonna, you know, I can win this case. And that's basically the way that conversation went.

Q.  Okay. Now at that time, did [trial counsel] say—tell you that the offer was seven years?

50

A.    No, he did not.

. . . .

Q.    Did [trial counsel] inform you at that time that . . . you can't do any more than 25 years?

A.    No, he never told me that. He never told me the maximum amount of time. . . .

Id. at 137-38. According to Goldberg, he learned about the statutory maximum only when he was preparing for his direct appeal. Id. at 138-39.

As to the third plea offer of June 19, Goldberg testified that he did not learn about this offer until he received a yellow card from the district attorney's office after filing his federal habeas petition. Id. at 138. This assertion by Goldberg is contradicted by the yellow card which states that the offer was made to trial counsel while Goldberg was present in court, and was rejected by counsel in Goldberg's presence. Id. at 76.

5.    *Issues Regarding Goldberg's Production at the October 24, 2007 Evidentiary Hearing*

By order dated December 3, 2007, the court found that since Goldberg or his counsel had not objected to Goldberg's physical absence from the October 24, 2007 evidentiary hearing pursuant to 28 U.S.C. § 2243 (para. 5), Goldberg had waived his production. See Order dated Dec. 3, 2007, Docket Entry No. 47. The court asked the parties to brief the issue. Id.

By letter dated December 5, 2007, the district attorney's office again noted its objection to the evidentiary hearing, arguing that Goldberg was constructively produced before the court when he participated via telephone, and that physical production was waived since neither Goldberg or his attorney objected. See Letter dated Dec. 5, 2007, Docket Entry No. 49.

51

Goldberg's attorney responded by letter dated December 10, 2007. <u>See</u> Letter dated Dec. 10, 2007, Docket Entry No. 50.

By affidavit dated December 7, 2007 and supported by correspondence with his appointed federal habeas attorney, Goldberg notified the court that it was always his intention to be physically produced at the October 24 evidentiary hearing. Affidavit dated Dec. 7, 2007, Docket Entry Nos. 51 and 52. He argued that he did not object to the production issue upon advice from his counsel. <u>Id.</u> ¶ 6-10, Docket Entry No. 52. He also contended that he was prejudiced by his participation via telephone:

> I was severely prejudiced by my absence from the hearing. Most importantly, I was unable to hear most of the testimony at the hearing, and struggled mightily to comprehend the questions that were posed to me. I actually informed the Court very early on in the hearing that I could not hear much at all. This inability to hear hampered my ability to fully participate in the proceeding, inasmuch as there was a significant amount of testimony that I simply could not make out. Moreover, it forced me to speculate on several occasions as to the exact questions which were being posed to me, inasmuch as I did not want to continuously request that the question be repeated. This uncertainty caused me to be very tentative when answering the questions, and had only a negative effect on the proceedings.

<u>Id.</u> at ¶ 11.

## III. Respondent's Objection to the October 24, 2007 Evidentiary Hearing

### A. *Law on Evidentiary Hearings in Federal Habeas Cases*

#### 1. *Statutes Regulating Evidentiary Hearings*

Various statutes and provisions from the Rules Governing Section 2254 Cases in United States District Courts ("Section 2254 Habeas Rule") regulate evidentiary hearings in habeas cases. Section 2243 of Title 28 United States Code, which was not amended by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110

Stat. 1214 (1996), provides:

> [4] When the writ or order is returned <u>a day shall be set for hearing, not more than five days after the return</u> unless for good cause additional time is allowed.

> [5] Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be <u>required to produce at the hearing the body of the person detained</u>.

> . . . .

> [8] The court shall <u>summarily hear and determine the facts</u>, and dispose of the matter as law and justice require.

28 U.S.C. § 2243 (emphasis added).

Section 2254 was amended by AEDPA. It provides in relevant part that under the

circumstances of this case an evidentiary hearing shall not be held:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

> <u>(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--</u>

>> (A) the claim relies on--

>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254 (emphasis added).

None of the elements of subsection (2) apply: there is no new rule of constitutional law, the factual predicate was previously discovered and investigated in a state court hearing, and the claimed error would not have affected a finding of guilt of the underlying offense. A full evidentiary hearing had been provided in state court since petitioner's claim was fully investigated by the trial court at the direction of the Appellate Division. Because Goldberg had developed the factual basis of his claims in state court, subsection (2)'s limitation is inapplicable. In the exercise of discretion another full evidentiary hearing was afforded in this federal court.

2.    *Rules Regulating Evidentiary Hearings*

Rule 8(a) of Section 2254 Habeas Rules, which is titled "Determining Whether to Hold a Hearing," provides as follows:

> If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to <u>determine whether an evidentiary hearings is warranted.</u>

28 U.S.C. § 2254 (Rule 8(a)) (emphasis added).

> Subsection (c), titled "Appointing Counsel; Time of Hearing," provides as follows:

> <u>If an evidentiary hearing is warranted, the judge must appoint an attorney</u> to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A. The judge must conduct the hearing as soon as practicable after giving the attorneys adequate time to investigate and prepare. These rules do not limit appointment of counsel under § 3006A at any stage of the proceedings.

28 U.S.C. § 2254 (Rule 8(c)) (emphasis added).

The advisory committee notes declare that "Rule 8 (a) is not intended to supersede the restrictions on evidentiary hearings contained in 28 U.S.C. § 2254 (e)(2)." <u>Id.</u> (advisory

committee notes). As already noted, that provision states that the court "shall not hold an evidentiary hearing" if the petitioner failed to develop the factual basis of the claim in state court.

*3.    Analysis of the Statutes, Rules and Caselaw*

Evidentiary hearings in habeas cases take place in less than 2% of all the filings. 1 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 20.1 (5th ed. 2005). Since the 1948 and 1966 amendments to section 2243, federal district courts have enjoyed broad discretion in deciding whether to hold an evidentiary hearing in a habeas case, but timing and production of the petitioner's body is specified. See 28 U.S.C. § 2243 (para. 4) ("When the [state answers the petition] a date shall be set for a hearing."); id. (para. 8) ("Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.").

In Townsend v. Sain, the court interpreted the 1948 statute, declaring that an evidentiary hearing must be held only if the state did not provide a "full and fair" one.

> Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.

Townsend v. Sain, 372 U.S. 293, 312-13 (1963) (emphasis added). The Court identified six circumstances in which an evidentiary hearing was required:

> We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any

reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

Id. at 313.

The fifth circumstance requires that if the petitioner does not develop factual evidence necessary to establish a constitutional violation in the state court, he must show that that it was not due to a violation of the deliberate bypass standard of Fay v. Noia, 372 U.S. 438 (1963). The Court also made clear that "[t]he purpose of the test is to indicate the situations in which the holding of an evidentiary hearing is mandatory." Id. at 318. The Court stated:

> In all other cases where the material facts are in dispute, the holding of such a hearing is in the discretion of the district judge. If he concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, he may, and ordinarily should, accept the facts as found in the hearing. But he need not. In every case he has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim. There is every reason to be confident that federal district judges, mindful of their delicate role in the maintenance of proper federal-state relations, will not abuse that discretion. We have no fear that the hearing power will be used to subvert the integrity of state criminal justice or to waste the time of the federal courts in the trial of frivolous claims.

Id. at 318 (emphasis added).

Townsend was overturned by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992) in one narrow respect: it replaced Fay's deliberate bypass standard governing a habeas petitioner's failure to develop the factual basis for a claim for the more stringent cause and prejudice standard:

> Because the holding of Townsend v. Sain that Fay v. Noia's deliberate bypass standard is applicable in a case like this had not been reversed, it is quite understandable that the Court of Appeals applied that standard in this case. However, in light of more recent decisions of this Court, Townsend's holding in this respect must be overruled. Fay v. Noia was itself a case where the habeas petitioner had not taken advantage of state remedies by failing to appeal -- a procedural default case. Since that time, however, this Court has rejected the deliberate bypass standard in state procedural default cases and has applied instead a standard of cause and prejudice.

Tamayo-Reyes, 504 U.S. at 5 (footnote omitted). The new procedural default rule had a familiar caveat: "habeas petitioner's failure to develop a claim in state-court proceedings will be excused and a hearing mandated if he can show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing." Id. at 12.

The occasions when a federal evidentiary hearing in state habeas case was required was limited by the AEDPA in 1996. AEDPA's amendments to section 2254(e)(2) substantially changed prior judge-made law regulating evidentiary hearings in one important context, the same context in which Tamayo-Reyes had previously modified Townsend: when "the applicant has failed to develop the factual basis in State court proceedings" and now seeks to do so in federal court. 28 U.S.C. § 2254(e)(2) (emphasis added). Section 2254(e)(2) leaves intact the portion of Townsend that Tamayo-Reyes also previously had left intact—those situations in which the failure to develop the factual basis of a habeas claim is not due to the fault of a habeas petitioner.

The Supreme Court addressed this issue in Williams v. Taylor, 529 U.S. 420 (2000). It noted that section 2254(e)(2), "[b]y the terms of its opening clause . . . applies only to prisoners who have 'failed to develop the factual basis of a claim in State court proceedings.' " Williams, 529 U.S. at 430. The Court explained:

> Our interpretation of § 2254(e)(2)'s opening clause has support in [Tamayo-Reyes], a case decided four years before AEDPA's enactment. In Keeney, a prisoner with little knowledge of English sought an evidentiary hearing in federal court, alleging his nolo contendere plea to a manslaughter charge was not knowing and voluntary because of inaccuracies in the translation of the plea proceedings. The prisoner had not developed the facts of his claim in state collateral proceedings, an omission caused by the negligence of his state postconviction counsel. The Court characterized this as the "prisoner's failure to develop material facts in state court." We required the prisoner to demonstrate cause and prejudice excusing the default before he could receive a hearing on his claim unless the prisoner could "show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing[.]

57

Section 2254(e)(2)'s initial inquiry into whether "the applicant has failed to develop the factual basis of a claim in State court proceedings" echoes [Tamayo-Reyes]'s language regarding "the state prisoner's failure to develop material facts in state court." In [Tamayo-Reyes], the Court borrowed the cause and prejudice standard applied to procedurally defaulted claims, deciding there was no reason "to distinguish between failing to properly assert a federal claim in state court and failing in state court to properly develop such a claim." As is evident from the similarity between the Court's phrasing in [Tamayo-Reyes] and the opening clause of § 2254(e)(2), Congress intended to preserve at least one aspect of [Tamayo-Reyes]'s holding: prisoners who are at fault for the deficiency in the state-court record must satisfy a heightened standard to obtain an evidentiary hearing. To be sure, in requiring that prisoners who have not been diligent satisfy § 2254(e)(2)'s provisions rather than show cause and prejudice, and in eliminating a freestanding "miscarriage of justice" exception, Congress raised the bar [Tamayo-Reyes] imposed on prisoners who were not diligent in state-court proceedings.

Id. at 432-33. See also Schriro v. Landrigan, 127 S. Ct. 1933, 1940 (2007) ("[A]EDPA generally prohibits federal habeas courts from granting evidentiary hearings <u>when applicants have failed to develop the factual bases for their claims in state courts</u>.") (emphasis added).

Notwithstanding section 2254(e)(2)'s limitation in its opening clause, federal habeas courts retain broad discretionary power to hold an evidentiary hearing (which it exercised in the present case)—as recognized in <u>Townsend</u> and endorsed by Congress in the Section 2254 Habeas Rules. See <u>Lochnar v. Thomas</u>, 517 U.S. 341, 326 (1996) ("[T]he district court is afforded a degree of discretion in determining whether to hold an evidentiary hearing."). In a pre-AEDPA opinion, the Court of Appeals for the Second Circuit held that <u>Tamayo-Reyes</u> does not impose a limitation on the district court's discretion to hold an evidentiary hearing:

[T]<u>ownsend</u> also made clear that a District Court retained the power to hold a hearing even though one was not required. . . . This aspect of Townsend remains the law. . . . the district courts still possess the discretion, which has not been removed by . . . [Tamayo-Reyes] to hold hearings even where they are not mandatory."

Pagan v. Keane, 984 F.2d 61, 64 (2d Cir. 1993) (citations and internal quotation marks omitted).

Pagan is still applicable after AEDPA's section 2254(e)(2) because it only applies in those situations when the failure to develop the factual basis of a claim is not due to any fault of a habeas petitioner. See Seidel v. Merkle, 146 F.3d 750, 753-55 (9th Cir. 1998) (agreeing with the Courts of Appeals for the Second Circuit in Pagan that "[T]amayo-Reyes does not affect the discretion of the federal courts to hold evidentiary hearing;" "[T]amayo-Reyes only modified the conditions under which an evidentiary hearing is required."); Neiblas v. Smith, 204 F.3d 29, 32 (2d Cir. 1999) (noting Pagan's interpretation of Tamayo-Reyes which "did not deprive district courts of their power to hold a hearing even though one was not required") (quotation marks omitted); Jones v. Vacco, 126 F.3d 408, 417 n. 2 (2d Cir. 1997) (citing Pagan and noting that "the district court is not limited to the state court record, and has discretion to conduct an evidentiary hearing.").

The Court of Appeals for the Second Circuit has suggested several factors to guide the district court in its decision whether to hold an evidentiary hearing: (1) existence of a factual dispute; (2) the strength of the proffered evidence; (3) the thoroughness of prior proceedings; and (4) the nature of the state court determination. Pagan, 984 F.2d at 64. Under Schriro, a federal district court must also consider AEDPA's deferential standard of review in deciding whether to hold an evidentiary hearing:

> "[a] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.

Schriro, 127 S. Ct. at 1940.

### B.    *Application of Law to Facts*

Section 2254(e)(2)'s limitation on a federal evidentiary hearing is inapplicable in this case because Goldberg developed the factual basis for both of his habeas claims in state courts. See Schriro, 127 S. Ct. at 1940 ("[A]EDPA generally prohibits federal habeas courts from granting evidentiary hearings <u>when applicants have failed to develop the factual bases for their claims in state courts</u>.") (emphasis added).

For the ineffective assistance of appellate counsel claim, Goldberg filed a pro se petition for a writ of error coram nobis seeking to vacate the decision of the Appellate Division on the basis of ineffective assistance of appellate counsel. See supra section II.B.2. Goldberg's forty-two page brief and ten-page reply in support of the application adequately raised the issue of appellate counsel's ineffectiveness in failing to argue that he was denied his right to a trial be twelve jurors and was prejudiced by a rushed verdict as a result of the illness of one juror. Id. Goldberg also referenced his communications with his appellate counsel—particularly the letter that counsel wrote to him after she had filed his direct appeal. Id.

Goldberg also thoroughly developed in state court the factual basis for his ineffective assistance of trial counsel claim. See supra section II.E.

Respondent's contention that this court was precluded by section 2254(e)(2) from holding an evidentiary hearing on October 27, 2007 is weighty. See supra section III.A. Yet, this court still retains discretion to provide an evidentiary hearing even when a habeas petitioner has developed the factual basis of his or her claim in state court. Id. While it appears anomalous, because Goldberg did fully develop the factual basis for both his claims in state court

and there were full and fair state hearings on the issue, the section 2254(e)(2) limitation on a federal evidentiary hearing is inapplicable.

This court's decision to hold an evidentiary hearing in this case was based upon the broad discretion afforded to federal habeas courts by the Supreme Court in <u>Townsend</u>, <u>Tamayo-Reyes</u>, and <u>Shriro</u>, and by the Court of Appeals for the Second Circuit in <u>Pagan</u>. To hold that section 2254(e)(2)'s limitation on evidentiary hearings applies in all situations where there was an adequate state hearing would deprive a federal habeas court of the power of determining the factual basis for the prerequisites and exceptions to the state's procedural defenses, e.g., whether petitioner exhausted state remedies; whether petitioner procedurally defaulted; whether there was "full and fair" litigation of a Fourth Amendment claim under <u>Stone v. Powell</u>, 428 U.S. 465 (1976); and—most important—whether justice had been rendered in the case.

Respondent's contention that the court was precluded from holding an evidentiary hearing by 28 U.S.C. § 2254(e)(1) is also unfounded. Section 2254(e)(1) requires "a determination of a factual issue made by a State court shall be presumed to be correct" and that the habeas applicant has the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The provision relates to burdens at a hearing; it does not itself preclude the hearing. As the Court of Appeals for the Sixth Circuit put the matter, "[a]pplying the presumption of correctness under § 2254(d) is an entirely separate and distinct issue from whether a district court may or is required to order an evidentiary hearing to settle allegedly disputed issues of material fact." <u>Abdur'Rahman v. Bell</u>, 226 F.3d 696 (6th Cir. 2000).

Although in the instant case the state court proceedings were thorough and the state court's determination of facts was sound, a federal evidentiary hearing was deemed desirable by

61

this court in the exercise of its discretion. On the ineffective assistance of trial counsel claim there remained a critical factual dispute as to whether state trial counsel conveyed plea offers to Goldberg and whether counsel advised Goldberg of sentence exposures. See Pagan, 984 F.2d at 64. As to the ineffective assistance of appellate counsel claim, a hearing was desirable to determine whether appellate counsel was ineffective when she failed to argue the ill juror issue and failed to inform Goldberg that she was not going to do so. This court, in deciding to hold an evidentiary hearing on October 24, 2007, considered whether Goldberg might be able to obtain habeas relief under 28 U.S.C. § 2254(d)'s deferential standard of review. See Schriro, 127 S. Ct. at 1940.

In sum, this court could have denied an evidentiary hearing. In retrospect, arguably it should not have granted the hearing. Yet, there are so many known miscarriages of justice that it is probably better for a federal judge not to ignore an informed sense that the state court conviction might have been "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

## IV. Production of Goldberg at the October 24, 2007 Evidentiary Hearing

### A. Law on Production of Habeas Petitioners at Federal Evidentiary Hearing

Section 2243 of Title 28 United States Code provides that "[u]nless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained." 28 U.S.C. § 2243 (para. 5). The Supreme Court has held that when a person is in state custody it is the responsibility of the state custodian to produce the prisoner before a federal court when directed to do so. See Penn. Bureau of Corrs. v. U.S. Marshals Svc., 474 U.S. 34 (1985).

In the years before the recent advances in communication technology, the Supreme Court stressed that the production of the prisoner at an evidentiary hearing is "[a] basic consideration in habeas corpus practice" and "the crux of the statutory scheme established by Congress; indeed, it is inherent in the very term 'habeas corpus.' " <u>Johnson v. Eisentrager</u>, 339 U.S. 763, 778 (1950). More than half a century ago, in <u>Walker v. Johnson</u>, the Court declared:

> [I]f an issue of fact is presented, the practice appears to have been to issue the writ, have the petitioner produced, and hold a hearing at which evidence is received. This is, we think, the only admissible procedure. Nothing less will satisfy the command of the statute that the judge shall proceed 'to determine the facts of the case, by hearing the testimony and arguments'. It is not a question what the ancient practice was at common law or what the practice was prior to 1867 when the statute . . . was adopted by Congress.

<u>Walker v. Johnston</u>, 312 U.S. 275, 285 (1941). This was long before our federal courthouses were equipped with video and telephone conferencing systems.

Section 2243's provision requiring physical production of the prisoner should be interpreted with consideration of how flexibly courts have treated other requirements of section 2243. In section 2243 Congress decreed that those in state custody who seek federal review of their state court convictions are entitled to a prompt ruling. A court entertaining an application for a writ of habeas corpus must "<u>forthwith</u> award the writ or issue an order directing the respondent to show cause why the writ should not be granted." 28 U.S.C. § 2243 para.1 (emphasis added). Required is a response from the person having custody "<u>within three days</u> unless for good cause additional time, not exceeding twenty days, is allowed." 28 U.S.C. § 2243 para.2 (emphasis added). Upon receiving the return certifying the cause of the prisoner's detention, the court must set a date for hearing "<u>not more than five days</u> after the return unless for good cause additional time is allowed." 28 U.S.C. § 2243 para.4 (emphasis added).

Notwithstanding the clarity of section 2243, the statute's speediness requirements have not been observed literally by federal courts. Habeas petitioners are routinely required to wait sixty or more days for respondents' returns; hearings are rarely if ever scheduled within five days after that. To the contrary, petitioners have frequently waited years before receiving a hearing—if a hearing was scheduled at all. Obeying the explicit directives of section 2243 is probably not possible under present calendar conditions in federal courts.

Courts have relied on various grounds in finding that mere failure to timely comply with section 2243 does not require granting the writ. See, e.g., Clutchette v. Rushen, 770 F.2d 1469, 1473-74 (9th Cir. 1985) (relying on precedence of Section 2254 Rule 4). But see Jones v. Shell, 572 F.2d 1278, 1280 (8th Cir. 1978) ("The writ of habeas corpus, challenging illegality of detention, is reduced to a sham if the trial courts do not act within a reasonable time. . . . Busy court dockets cannot justify a 14-month delay in processing this claim from the date of remand. . . . We find this delay has denied petitioner constitutional due process."). Granting of the writ to those in state custody on the ground that their petitions were not timely processed and resolved would result in the release from state prisons of hundreds of prisoners who are properly incarcerated. Such a jail delivery would be contrary to congressional design as manifested by the AEDPA.

The legislature and the courts should try to devise more workable speedy disposition rules, and then really enforce them.

Section 2243's directive that the petitioner's body be produced in court for an evidentiary hearing, if followed in any substantial proportion of state habeas cases, would place an intolerable strain on our federal and state prison systems. As Justice Brennan observed in the

context of a 28 U.S.C. § 2255 application, "[n]ot every colorable allegation entitles a federal prisoner to a trip to the sentencing court." <u>Sanders v. United States</u>, 373 U.S. 1, 20 (1963).

Telephonic or video participation by a habeas petitioner does seem to run counter to the very term habeas corpus—have the prisoner's body in court. Yet, it does lessen the almost impossible administrative burdens involved in the transportation of prisoners to and from a habeas court. Whether a habeas petitioner appears in person or telephonically, a habeas court may maintain the necessary perspective that petitioner is a human being who deserves to be treated with fairness and dignity.

**B.**    ***Law on Waiver of Production in a Habeas Evidentiary Hearing***

Although this appears to be an issue of first impression, it is apparent that production at a federal habeas evidentiary hearing may be waived if a habeas petitioner or his or her attorney fails to object to non-production at or before the hearing. <u>Cf.</u> Fed. R. Crim. P. 43(c) (waiver of production in federal criminal proceeding); <u>see</u> 28 U.S.C. § 2254 (Rule 8(c)) (requiring appointment of counsel when a district court decides to hold an evidentiary hearing); <u>Graham v. Portuondo</u>, 506 F.3d 105 (2d Cir. 2007) (holding that a district court commits reversible error when it decides to hold an evidentiary hearing and fails to appoint counsel for petitioner). <u>See also</u> 28 U.S.C. § 2243 (para. 5) ("[u]nless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.").

By analogy to criminal trials presence of the petitioner may be waived by failing to object. In a criminal proceeding Federal Rule of Criminal Procedure 43 requires a defendant's presence at (1) the initial appearance, the initial arraignment, and the plea; (2) at every trial stage,

including jury impanelment and the return of the verdict; and (3) sentencing. Fed. R. Crim. P.

43(a). The rule also approves waivers:

> (1) In General. A defendant who was initially present at trial, or who had pleaded guilty or nolo contendere, waives the right to be present under the following circumstances:
>
>> (A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial;
>>
>> (B) in a noncapital case, <u>when the defendant is voluntarily absent</u> during sentencing; or
>>
>> (C) when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom.
>
> (2) Waiver's Effect. If the defendant waives the right to be present, the trial may proceed to completion, including the verdict's return and sentencing, during the defendant's absence.

Fed. R. Crim. P. 43(c) (emphasis added). Although Rule 43 of the Federal Rules of Criminal

Procedure is inapplicable in a 28 U.S.C. § 2254 habeas proceeding collaterally attacking a state

court conviction, it provides some guidance on when a habeas petitioner waives physical

production at an evidentiary hearing.

When an evidentiary hearing is held with counsel for the petitioner present, a petitioner

waives physical production of his or her body upon a failure to object at the hearing or prior to

thereto. The fact that imprisonment compels the absence is not decisive. A prisoner may well

wish to avoid the onerous transportation problems and interference with prison routines.

*C.      Application of Law to Facts*

By order dated August 2, 2007, the court informed the parties that "[a]n evidentiary

hearing shall be held on October 24th at 10:00 a.m. The warden is to have the petitioner

available via telephone to participate at the hearing." See supra section II.F.1. Counsel was appointed on August 8, 2007. See supra section II.F.2. When respondent objected to an evidentiary hearing, Goldberg's attorney responded and specifically addressed the court's August 2, 2007 order scheduling the evidentiary hearing. See supra section II.F.3.

By order dated September 12, 2007, the court again stated that Goldberg was to participate at the hearing via telephone. See id. Despite this early and repeated notice, at no time between August 2, 2007 and October 24, 2007, did Goldberg or his counsel object to petitioner not being physically produced at the hearing. Goldberg or counsel also did not complain about the telephonic arrangements during the four hour evidentiary hearing. Thus Goldberg waived his physical production.

Goldberg's waiver of production did not adversely affect the decision on his claims of constitutional violations in state courts. This court was able to hear Goldberg clearly; his own testimony was lucid. See supra section II.F.4.d. The courtroom was cleared at the conclusion of the testimony of each witness to give Goldberg an opportunity to consult with counsel. Id. The factual determinations with regards to the ineffective assistance of trial counsel claim are primarily based on the yellow cards and the testimony of trial counsel—not Goldberg's. Id.

Goldberg's testimony as to the ineffective assistance of appellate counsel claims was immaterial to the adjudication of the claim; the court's factual determination for this claim is based on Goldberg's written communication with appellate counsel during the state court direct appeal process, counsel's brief on direct appeal and her testimony in this court. See infra section V.

67

## V.   Ineffective Assistance of Appellate and Trial Counsel

The writ of habeas corpus is available to any person held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Since this petition was filed after AEDPA's enactment, the provisions of AEDPA govern to the extent applicable. See Williams v. Taylor, 529 U.S. 362, 402-03 (2000).

### A.   *Application of AEDPA*

### *1.   Standard of Review*

Under AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court opinion adjudicates on the merits for the purposes of the AEDPA when it "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001) (internal quotation marks omitted). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [] [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13 (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from []

[the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. In order to grant the writ, there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

"Clearly established federal law" refers only to the holdings of the Supreme Court. Williams, 529 U.S. at 412. The Court of Appeals for the Second Circuit has noted that "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Rodriguez v. Miller, 499 F.3d 136, 140 (2d Cir. 2007). The Supreme Court has instructed federal habeas courts to read its holdings narrowly and to disregard as dicta much of the underlying logic and rationale of its decisions. See Carey v. Musladin, 127 S. Ct. 649, 653-54 (2006).

2.   *Presumption of Correctness and Exhaustion*

Determination of factual issues made by a state court "shall be presumed to be correct;" the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state petitioner must exhaust state court remedies before seeking federal habeas relief. See 28 U.S.C. § 2254(b)(1)(A); Ex Parte Royall, 117 U.S. 241 (1886). The petitioner must have

referred to relevant federal constitutional provisions when presenting the issues to the state court. See supra section III.B; see also Baldwin v. Reese, 541 U.S. 27 (2004).

### 3. Application of Law to Facts

Goldberg has exhausted his claims of ineffective assistance of appellate and trial counsel in state courts. The ineffective assistance of appellate counsel claim was exhausted by his coram nobis application to the Appellate Division. See supra section II.B.2. The ineffective assistance of trial counsel claim was exhausted by the renewed motion to vacate judgment before the state trial court. See supra section II.E.4. Goldberg referred to relevant federal constitutional provisions when he presented these claims to state courts. See supra section III.B.

The deferential standard of review in 28 U.S.C. § 2254(d) applies because the state court adjudicated Goldberg's claims on the merits. Although the denial of Goldberg's coram nobis application alleging ineffective assistance of appellate counsel by the appellate division was announced in a summary opinion, the court did not refer to a state procedural default rule and cited federal law pertaining to the merits of the claim—appellate counsel's failure to raise issues on appeal. See supra section II.B.2. The trial court denial of Goldberg's motion to vacate alleging ineffective assistance of trial counsel thoroughly discussed the merits of the claim. See supra section II.E.4.

### B. Law on Ineffective Assistance of Counsel

### 1. Generally

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. For habeas cases filed under AEDPA, a federal district court is limited to the Supreme Court's

decision in <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984) as the "clearly established federal law, as determined by the Supreme Court." <u>Lindstadt v. Keane</u>, 239 F.3d 191, 204 (2d Cir. 2001). <u>But see</u> U.S. Const. art. Art. III, § 1 (vesting the judicial power of the United States in "one supreme Court, <u>and</u> in such inferior Courts as the Congress may from time to time ordain and establish.") (emphasis added). Federal habeas courts are not precluded from considering the decisions of inferior federal courts, as "helpful amplifications of Supreme Court precedent," in "evaluating whether the state court's application of the law was reasonable." <u>Matteo v. Superintendent</u>, 171 F.3d 877, 890 (3d Cir. 1999) (en banc).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. <u>Strickland</u>, 466 U.S. at 687-88, 694. There is an assumption that counsel's conduct fell within the wide range of reasonable assistance. <u>Id.</u> The two-prong <u>Strickland</u> standard is "highly demanding." <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 382 (1986).

The performance and prejudice prongs of <u>Strickland</u> may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." <u>Id.</u> at 697. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." <u>Lindstadt v. Keane</u>, 239 F.3d 191, 202 (2d Cir. 2001). <u>See also</u> Jeffrey L. Kirchmeier, *Drink, Drugs, and Drowsiness: The Constitutional Right to Effective Assistance of Counsel and the Strickland Prejudice Requirement*, 75 NEB. L. REV. 425 (1996). The court must

keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Purdy v. Zeldes, 337 F.3d 253, 260 (2d Cir. 2003) (quoting Strickland, 466 U.S. at 694).

As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. The Court of Appeals for the Second Circuit has implied that all of counsel's significant trial decisions must be justified by a sound strategy—a significant raising of the bar that would appear to require an unrealistic degree of perfection in counsel. See Eze, 321 F.3d at 136 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for . . . counsel's decisions").

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Each factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. See Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991) (dismissing petition as unexhausted where petitioner's claim of ineffective

assistance of counsel alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (internal quotation marks omitted)). Where an additional factual claim in support of the ineffective assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal of the added claim is not required. Caballero v. Keane, 42 F.3d 738, 741 (2d Cir. 1994).

2.    *Plea Process*

The Court of Appeals for the Second Circuit has observed that "[t]he decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case . . . [and] counsel may and must give the client the benefit of counsel's professional advice on this crucial decision." Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996) (quoting ANTHONY G. AMSTERDAM, TRIAL MANUAL 5 FOR THE DEFENSE OF CRIMINAL CASES (1988)); see also NEW YORK LAWYER'S CODE OF PROFESSIONAL RESPONSIBILITY, EC 7-7 (2007) ("A defense lawyer in a criminal case has the duty to advise the client fully on whether a particular plea to a charge appears to be desirable . . . but it is for the client to decide what plea should be entered . . .").

The Supreme Court has held that the Strickland standard applies to claims arising out of the plea process:

> We hold . . . that the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the Strickland v. Washington test is nothing more than a restatement of the standard of attorney competence . . . . The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must

73

show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 58 (1985) (footnote omitted).

The Court of Appeals for the Second Circuit has explained that a criminal defense lawyer must always convey the terms of a plea offer to a defendant; failure to do so is in effect a per se violation of the first prong of Strickland:

> We recently considered whether defense counsel renders ineffective assistance when he fails to give his client any advice as to the acceptance of a plea bargain offered by the prosecution. See Boria v. Keane, 99 F.3d 492, 496-97 (2d Cir. 1996). . . . In that case, the defendant had proclaimed his innocence to his lawyer, the prosecution had offered a plea bargain with a sentence of one to three years, and, without the plea bargain, the defendant faced sentencing for a Class A-I felony for which the minimum term of imprisonment is 15 to 25 years and the maximum term is life. . . . We ruled that failure to give any advice concerning acceptance of the plea bargain was below the standard of reasonable representation.
>
> Boria recognizes a lawyer's general duty to advise a defendant concerning acceptance of a plea bargain. A defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable. Even if there might be circumstances where defense counsel need not render advice as to acceptance of a plea bargain, there can be no doubt that counsel must always communicate to the defendant the terms of any plea bargain offered by the prosecution. In this case, the failure to do so was aggravated by the absence of any advice concerning the plea bargain and the significantly inaccurate calculation of sentencing ranges upon a plea and upon conviction after trial.

Cullen v. United States, 194 F.3d 401, 404 (2d Cir. 1999) (emphasis added; some citations and footnote omitted).

As to Strickland's prejudice requirement vis-à-vis plea offers, a habeas petitioner may be prejudiced if he or she would have accepted the un-conveyed plea offer which was significantly lower than the actual sentence. Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (sentencing disparity of at least 113 months and petitioner's statement that he would have

accepted the offer is sufficient to support prejudice finding); <u>Mask v. McGinnis</u>, 233 F.3d 132, 141-42 (2d Cir. 2000) (large disparity in sentencing exposure coupled with petitioner's statement that he would have accepted reasonable plea offer satisfies prejudice requirement); <u>see also</u> <u>Cullen</u>, 194 F.3d at 407-08 (stating that disparity between actual sentence and sentence available through plea bargain is a factor in determining whether petitioner suffered prejudice).

3.    *Sentence Exposure*

Counsel must also advise the defendant on the maximum sentencing exposure if he stands trial. <u>See</u> <u>United States v. Gordon</u>, 156 F.3d 376, 380 (2d Cir. 1998) ("[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty."); <u>United States v. Day</u>, 969 F.2d 39, 44 (3d Cir. 1992) (holding that counsel was ineffective by giving defendant substandard advice about sentence exposure under the Sentencing Guidelines during plea negotiations).

In <u>Gordon</u>, the Court of Appeals for the Second Circuit held that counsel was ineffective when he inaccurately told petitioner that his maximum sentence exposure was 120 months, when in fact it was 327 months. <u>Gordon</u>, 156 F.3d at 377. The court found that the petitioner's ineffective assistance of counsel claim met the <u>Strickland</u> test because:

> By grossly underestimating [petitioner's] sentencing exposure in a letter to his client, [counsel] breached his duty as a defense lawyer in a criminal case to advise his client fully on whether a particular plea to a charge appears desirable. Therefore, we agree with the district court in finding that [counsel's] legal assistance fell below the prevailing professional norms for advising a client during plea negotiations of his maximum exposure to imprisonment at sentencing.

<u>Id.</u> at 380 (quotation marks and citations omitted).

75

4.  *Appellate Counsel*

Although the Strickland test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. See Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made. Jones v. Barnes, 463 U.S. 745, 754 (1983). The Supreme Court has noted, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Id. at 751-52. A petitioner may, however, establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

As to Strickland's prejudice prong in the appellate context, the Court of Appeals for the Second Circuit has held that:

> [A] petitioner must demonstrate that there was a reasonable probability that his claim would have been successful before the state's highest court. We have ruled that the fact that the omitted claim involved a right that had not yet explicitly been recognized by the state's highest court does not preclude such a finding. Where the highest court's eventual ruling was easily predictable, we have held that even an adverse ruling by the intermediate appellate court on the very claim at issue did not preclude a finding that there was a reasonable probability that the claim would have succeeded in the state's highest court.

Id. at 534.

Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the . . . claim fell outside the wide range of professionally competent assistance." Id. (internal quotation marks omitted).

76

The New York Court of Appeals has decreed that appellate counsel (1) make no adverse comment about client's frivolous claims before the appellate court; and (2) "should instruct his client why he believes the points frivolous and advise him that if he still thinks they should be addressed, defendant may file a pro se brief with the court." New York v. Vasquez, 509 N.E.2d 934, 935 (N.Y. 1987). In relation to the second requirement, if the client wishes to file a pro se brief, "counsel should protect his client's opportunity to submit written argument on the points by notifying the court of his intentions." Id. The Court of Appeals has further explained its decision in Vasquez:

> In Vasquez, we held that a defendant was denied effective assistance of counsel when his attorney wrote a brief disparaging several arguments his client sought to raise, thereby effectively precluding the client from successfully presenting these arguments pro se. We stated that counsel who adopts and submits nonfrivolous appellate issues on behalf of the defendant but refuses to raise other issues requested, should explain to the client why the other issues should not be submitted and advise the client that, if he or she wishes, permission may be sought to file a supplemental brief with the appellate court. Our discussion in Vasquez addressed the ethical obligation counsel owes a client; we did not create any right on behalf of indigent defendants to act as cocounsel on appeal when represented by counsel presenting nonfrivolous issues.

New York v. White, 539 N.E.2d 577, 582 (1989).

The Court of Appeals for the Second Circuit has apparently not addressed Vasquez in relation to the Strickland standard. Although it appears that appellate counsel has the duty to tell the client why the particular claims that the client wishes to pursue on appeal are frivolous and advise the client of the right to file a pro se supplemental brief, a failure to do so—without more—does not automatically result in ineffective assistance of appellate counsel under Strickland. See Strickland, 466 U.S. at 689 (noting that a "set of rules [for counsel's conduct] would interfere with the constitutionally protected independence of counsel and restrict the wide

latitude counsel must have in making tactical decisions"). See also Lovacco v. Kelly, No. 99-CV-3094, 2002 WL 31045942, at *10 (S.D.N.Y. June 13, 2002) (magistrate's report and recommendation) (rejecting petitioner's claim that appellate counsel was ineffective in not raising frivolous claims on appeal but informed the client about filing a supplemental brief); Farr v. Greiner, 01-CV-6921, 2007 WL 1094160, at *40 (E.D.N.Y. April 10, 2007) (adopting magistrate's report and recommendation) (same); Reid v. Giambruno, No. 03-CV-0250, 2007 WL 3232497, at *27 (W.D.N.Y. Oct. 31, 2007) (magistrate's report and recommendation) (same, but counsel did not inform client about filing a supplemental brief).

## C.    *Application of Law to Facts*

### 1.    *Trial Counsel*

Goldberg alleges that trial "counsel was ineffective for failing to convey the terms of a plea offer to the petitioner, failing to advise the petitioner concerning whether he should consider accepting the plea offer, and grossly misrepresenting the petitioner's sentence exposure." See Amend. Habeas Pet. at 2. The adjudication of these claims depends largely on a resolution of the facts.

### a.    Failing to Convey or Advise on Plea Offers

Goldberg admits to being informed by state trial counsel about the December 8, 1997 plea offer. According to Goldberg, the district attorney's office agreed to recommend a seven year sentence to the sentencing judge in this offer. This claim is contradicted by Kiernan's testimony and is not supported by the yellow cards—the authenticity of which are not in dispute. Kiernan testified that the district attorney's office did not take a position as to a sentence in the December 8, 1997 plea offer; this conclusion is supported by the yellow cards.

For the second plea offer of March 9, 1998, Goldberg was made aware by state trial counsel that an offer was made—yet, according to Goldberg, his counsel failed to convey the terms of the offer and failed to advise Goldberg about considering the offer. Goldberg's allegation that his attorney failed to convey the terms of the offer is contradicted by the yellow cards and Kiernan's testimony. As noted above, Goldberg admits to being aware of a plea offer with a recommendation of a seven year sentence. This offer of a seven years recommendation was not, as Goldberg says, made on December 8, 1997. Instead, as the yellow cards indicate, this was the March 9, 1998 plea offer, which according to Goldberg, his counsel did not convey. Goldberg's assertion that he was not informed of the June 19, 1998 plea offer is also contradicted by the yellow card which states that the offer was made to counsel while Goldberg was present in court

The evidence is overwhelming that counsel conveyed the terms of all three plea offers. Counsel's testimony in the state court and this court on this point is consistent: he always informed his clients of a plea offer. The credibility of trial counsel is accepted by this court. If this were his invariable practice, he informed the petitioner in the instant case. This conclusion is buttressed by the fact that this kind of offer and discussion with the defendant is critical in every case. No attorney wants to try a case unnecessarily if a plea satisfactory to his client can be had. In this case, a prior hung jury voted ten to two for conviction, suggesting a strong possibility of conviction after a second trial. Petitioner admits that he was informed of the offer before the first trial. Evidence that trial counsel consulted the defendant extensively before and during the second trial supports the conclusion that all the offers were made known to petitioner.

Goldberg's veracity on this point is suspect. The court need not find that he was lying. The human mind and memory is flexible, tending to hide even from itself, its own grave errors of judgment. Thus, even if he does believe now that he was not informed, it is highly probable that this belief is mistaken.

The fact that a yellow card declared that the offer was rejected out of hand has no bearing on this analysis. It does not suggest that before the rejection was made the matter had not been discussed with Goldberg. This kind of "rejection" is normal parleying in negotiations; it is entitled to no weight.

This court's findings of fact as to the conveyance of all plea offers is consistent with those by the state court. Goldberg has not shown—even by a preponderance—and certainly not by clear and convincing evidence required by AEDPA—that the state decisions denying his collateral attacks were mistaken. See 28 U.S.C. § 2254(e)(1). This court concluded that trial counsel informed and advised Goldberg about all plea offers. The defense attorney's total performance was well above the <u>Strickland</u> standard. <u>See</u> <u>Cullen</u>, 194 F.3d at 404. Since Goldberg admits to having rejected a plea offer with a seven year recommendation, he has not convincingly shown that he was prejudiced. <u>See</u> <u>Pham</u>, 317 F.3d at 182.

<u>b.</u>    <u>Misrepresentation of Sentence Exposure</u>

According to Goldberg, his state trial counsel did not tell him that the seven year sentence recommendation by the district attorney's office was the minimum term of imprisonment he could receive upon conviction. This failure, Goldberg asserts, led him to believe that he could receive less than seven years if convicted after trial—which is why he rejected the plea offer. When Goldberg asked counsel about the maximum sentence exposure, counsel told him,

80

according to the petitioner, that he would likely not receive more than ten years imprisonment because the judge was "fair." From this, Goldberg contends he was led to believe that a sentence of ten years instead of twenty-five years was the statutory maximum.

Goldberg's claim that he was not made aware of the maximum sentence throughout the completion of two trials, as well as the trial and sentence preparation periods is not believable. As did the state court, this court credits his counsel's testimony. Counsel had represented Goldberg from the outset and testified to repeated meetings with Goldberg, as well as his family members. It is unlikely that discussions concerning alternatives to trial did not occur on these occasions. Counsel testified that there had never been a time in his professional career that he did not discuss with a criminal client the client's maximum exposure. Petitioner himself was an intelligent and experienced criminal who would almost certainly have wanted to inform himself of the maximum penalty he faced. The evidence and context establishes to a high degree of probability that counsel advised petitioner of the maximum sentence. See Gordon, 156 F.3d at 380.

2.    *Appellate Counsel*

Goldberg argues that he was denied effective assistance of appellate counsel because his appellate attorney failed to raise a strong ill juror claim on his direct appeal, while asserting significantly weaker arguments. See supra section II.B.2. This claim was rejected by the Appellate Division, which cited the Supreme Court's decision in Jones, 463 U.S. 745, and found that Goldberg has failed to establish that he was denied effective assistance of appellate counsel. See id. Although Jones is not the standard for the determining ineffective assistance of appellate counsel, the Court of Appeals for the Second Circuit has applied the "unreasonable application"

81

clause of 28 U.S.C. § 2254(d)(1) to a state court opinion relying on Jones. See Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000); see also Williams, 529 U.S. at 413 ("Under the "unreasonable application" clause [of 28 U.S.C. § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.") (emphasis added).

Goldberg argues that appellate counsel should have raised the following ill juror-related issues on appeal: (1) the juror was unable to fully participate in the deliberations; (2) the court's suggestion of sequestration influenced the juror to continue to deliberate and caused the verdict to be rushed; and (3) the trial court should have discharged the juror, or, in the alternative, adjourned the case.

Appellate counsel filed a sixteen-page brief in the Appellate Division which clearly and concisely summarized approximately three hundred pages of trial minutes. She raised two serious claims: (1) that the fingerprint evidence was insufficient to prove that Goldberg was involved with the crime; and (2) that the verdict was against the weight of the evidence. Both of these issues, which contained appropriate references to the record as well as citations to applicable case law, were argued cogently.

When the Appellate Division unanimously affirmed the judgment, defense counsel timely applied for leave to appeal to the New York Court of Appeals. She submitted a seven-page letter that highlighted the reasons the case was appropriate for review.

It is clear from appellate counsel's testimony and a review of the court record that counsel did not raise these claims because she correctly believed them to be unpreserved. When the juror complained about being ill for the first time, he agreed that he could continue

82

deliberating for a while longer. Prosecution and defense agreed to allow the juror to return to deliberate. The court told the juror to return to the jury room and to continue to deliberate as long as he was able and that it would discuss the situation with the attorneys. When the juror returned the second time to complain, defense counsel consented to the court's solution. When the verdict was returned shortly thereafter, counsel did not suggest that the verdict was rushed. Counsel, the court and Goldberg had an opportunity to observe the juror, so that his demeanor undoubtedly helped explain the defense's failure to object.

There is no evidence that the juror was too sick to participate in deliberations. Appellate counsel correctly concluded that the ill juror issue was not supported by the record. A review of the state transcript reveals that the trial court did not err in not adjourning the deliberations. "Only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the [Constitution]." Drake v. Portuondo, 321 F.3d 338 (2d Cir. 2003) (quoting Morris v. Slappy, 461 U.S. 1, 12 (1983)). Nothing remotely approaching unreasonableness or arbitrariness occurred here.

Appellate counsel's conclusion that the issue was unpreserved for appellate review is in accord with long-established New York law. See New York v. Williams, 46 N.Y.2d 1070, 1071 (1979); New York v. Heide, 84 N.Y.2d 943, 944 (1994); New York v. Thompson, 34 A.D.3d 852, 853-54 (N.Y. App. Div. 2d Dep't 2006).

Goldberg presented this claim to the Appellate Division in his coram nobis application, the same court that had dismissed his direct appeal. See supra section II.B.2. That court agreed that the ill juror issue was without merit. See id.

83

As to Goldberg's claim that appellate counsel failed to inform him that she would not be raising the ill juror claim on appeal and that Goldberg could file a supplemental pro se brief, the court agrees that it would have been better practice for appellate counsel to have informed Goldberg of this alternative. Failure to so, without more, did not violate any State or Federal constitutional right to counsel. The Appellate Division's denying Goldberg's coram nobis application and rejecting his claim that appellate counsel was ineffective, as well as the record and law supports this court's conclusion beyond a reasonable doubt that asserting this claim by counsel or petitioner would not have resulted in a reversal. The second branch of the Strickland rule—prejudice—was not established.

## VI. Certificate of Appealability

Section 2253(c)(1) of Title 28 of the United State Code provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding . . . ." 28 U.S.C. § 2253(c)(1). In order to obtain a certificate of appealability, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

A certificate of appealability is issued on the following questions: (1) whether Goldberg had waived his physical production in court at the evidentiary hearing by failing to object; (2) whether appellate counsel was ineffective in failing to raise the "ill juror" claim on appeal; and (3) whether appellate counsel's failure to inform petitioner about filing a pro se brief raising the ill juror issue constituted ineffective assistance of counsel. The petitioner may request the Court of Appeals for the Second Circuit to add other issues for consideration on appeal.

## VII.  Conclusion

An evidentiary hearing was properly held by this court; Goldberg waived his physical production by failing to object.  He had the benefit of experienced and competent attorneys in both his state and federal proceedings.  His state trial counsel conveyed the terms of, and advised him about, all plea offers, and informed him of the maximum sentence exposure.  Appellate counsel properly chose not to pursue the ill-juror issue on direct appeal since it was unpreserved for appellate review.  Had this issue been argued by appellate counsel or appellant himself it would not have resulted in a reversal.

A certificate of appealability is issued.  The clerk of the court shall close the case.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: January 23, 2008
Brooklyn, New York